ACCEPTED
01-15-00374-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
7/27/2015 5:40:09 PM
CHRISTOPHER PRINE
CLERK

## NO. 01-15-00374-CV

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
7/27/2015 5:40:09 PM
CHRISTOPHER A. PRINE
Clerk

In the Court of Appeals for the
First District of Texas – Houston

# THE UPPER TRINITY REGIONAL WATER DISTRICT, AND THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,

*Appellants,*

v.

# NATIONAL WILDLIFE FEDERATION,

*Appellee.*

ON APPEAL FROM THE 126TH DISTRICT COURT
TRAVIS COUNTY, TEXAS

# BRIEF OF APPELLEE

Myron J. Hess
State Bar No. 09549415
Annie E. Kellough
State Bar No. 24074517

NATIONAL WILDLIFE FEDERATION
44 East Ave., Ste. 200
Austin, Texas 78701
Telephone: (512) 610 – 7754
Facsimile: (512) 476 – 9810
hess@nwf.org
kellougha@nwf.org

*Attorneys for Appellee National Wildlife Federation*

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ 2

INDEX OF AUTHORITIES ......................................................................................... 4

STATEMENT REGARDING ORAL ARGUMENT ..................................................... 8

STATEMENT OF THE CASE ..................................................................................... 9

ISSUES PRESENTED ............................................................................................... 12

STATEMENT OF FACTS .......................................................................................... 13

    A.    The District submitted an application to TCEQ for Water Use Permit No.
           5821 for the construction of Lake Ralph Hall and for an interbasin transfer of
           water from the Sulphur River Basin to the Trinity River Basin. .................. 13

    B.    The Parties participated in a contested case hearing at State Office of
           Administrative Hearings. ............................................................................... 13

    C.    TCEQ granted the District's application for Water Use Permit No. 5821... 15

    D.    District Court determined that TCEQ erred in granting the District's permit
           due to lack of compliance with Water Code Section 11.085 (l)(2). .............. 15

SUMMARY OF THE ARGUMENT ........................................................................... 17

ARGUMENT ............................................................................................................... 21

    A.    Standard of Review: ...................................................................................... 21

    B.    TCEQ erred by approving issuance of the permit in the absence of a water
           conservation plan meeting the explicit statutory prerequisites of Section
           11.085 (l)(2) of the Water Code. .................................................................. 23

        1.    Section 11.085 (l)(2) establishes an unambiguous and stringent
            prerequisite to approval of an interbasin transfer. .................................. 23

        2.    TCEQ ignored the plain language of Section 11.085 (l)(2) and allowed
            the District to choose what levels of conservation and efficiency to
            include ..................................................................................................... 28

        3.    Report 362 is not an adequate test for compliance with Section 11.085
            (l)(2) ...................................................................................................... 31

        4.    The Region C Water Plan conservation recommendations do not justify
            reliance on Report 362 or demonstrate compliance with Section 11.085
            (l)(2) ...................................................................................................... 38

C.  TCEQ erroneously approved the District's application even though the District has not demonstrated that it has implemented its water conservation plan as required by Section 11.085 (l)(2) of the Water Code........................ 43

D.  TCEQ erred in determining that the District's water conservation plan includes the means for implementation and enforcement required by TCEQ's rules.................................................................................................................. 49

E.  TCEQ erred in determining that the District's water conservation plan includes the required basis for the development of its five-year and ten-year targets for water savings in accordance with TCEQ's rules......................... 57

F.  TCEQ's errors prejudiced NWF's substantial rights within the meaning of Section 2001.174 (2) of the Government Code............................................ 60

PRAYER.................................................................................................................... 64

CERTIFICATE OF COMPLIANCE....................................................................... 65

CERTIFICATE OF SERVICE................................................................................. 66

**References to the administrative record will be AR, Vol. No., Item, Page number(s).**

# INDEX OF AUTHORITIES

## Cases

*City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179 (Tex. 1994) ...................22

*City of El Paso v. Public Utility Commission of Texas*, 839 S.W.2d 895 (Tex.App. – Austin 1992) ........................................................................................22, 56

*City of Marshall v. City of Uncertain*, 206 S.W.3d 97 (Tex. 2006)........................24

*City of San Antonio v Pollock*, 284 S.W.3d 809 (Tex. 2009)..................................46

*City of San Antonio v. City of Boerne*, 111 S.W.3d 22 (Tex. 2003)........................24

*City of San Antonio v. Pollock*, 284 S.W.3d 809 (Tex. 2009)................................52

*Dallas Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377 (Tex. 1956).....................46

*Duncan-Hubert v. Mitchell*, 310 S.W.3d 92, 101 (Tex.App. – Dallas 2010) .........53

*Flores v. Employees Retirement System of Texas*, 74 S.W.3d 532 (Tex.App.—Austin 2002, pet. denied)................................................................................59

*Hamamcy v. Texas State Bd. of Medical Examiners*, 900 S.W.2d 423 (Tex. App. - Austin 1995) ......................................................................................54

*Jelinek v. Casas*, 328 S.W.3d 526 (Tex. 2010) .............................................45, 52, 60

*Johnson v. City of Fort Worth*, 774 S.W.2d 653 (Tex. 1989) .................................39

*Lone Star R.V. Sales v. Motor Vehicle Bd. of Tex. Dep't of Transp.*, 49 S.W.3d 492 (Tex. App.—Austin 2001, no pet.)....................................................................62

*McIntyre v. Ramirez*, 109 S.W.3d 741 (Tex. 2003) ...................................................24

*Nadaf v. Texas Comm'n on Environmental Quality*, No. 04-13-00068-CV (Tex. App. 2014) ...................................................................................................................21

*Old Am. County Mutual Fire Ins. Co. v. Sanchez*, 149 S.W.3d 111 (Tex. 2004) ...24

*R.R. Comm'n v. Rio Grande Valley Gas Co.*, 683 S.W.2d 783 (Tex. App. Austin 1984) ...................................................................................................................61

*Reliant Energy, Inc v. Public Util. Comm'n*, 153 S.W. 3d 174 (Tex. App – Austin 2004, pet. denied)..................................................................................................22

*Rogers v. Texas Bd. Of Architectural Examiners*, 390 S.W.3d 377. (Tex. App. – Austin 2011) ........................................................................................................46

*State of Texas' Agencies and Institutions of Higher Learning et al v Public Utility Commission of Texas et al*, No. 03-11-00072-CV (Tex. App. – Austin 2014).......22

*Texas A.B.C. v. Top of the Strip*, 993 S.W.2d 242 (Tex. App. – San Antonio 1999). ...........................................................................................................................47, 54

*Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446 (Tex. 1984),..........................................................................................................62

*Texas Water Development Board v. Ward Timber*, 411 S.W.2d 554 (Tex.App.— Eastland, 2013) ...................................................................................................60

*Texas Workers' Comp. Comm'n v. Cont'l Cas. Co.*, 83 S.W.3d 901 (Tex. App. – Austin 2002) .......................................................................................................33

*United Sav. Ass'n of Tex. v. Vandygriff*, 594 S.W.2d 163 (Tex. Civ. App.—Austin 1980) ...............................................................................................................61, 62

## Statutes

Tex. Gov't Code Ann. Section 2001.174(2)........................................................22, 60

Tex. Gov't Code Section 2001.172 ................................................................21

Tex. Water Code Section 11.085................................................................39

Tex. Water Code Section 11.085 (a) ................................................................17

Tex. Water Code Section 11.085 (k)(2)(c) ................................................................39

Tex. Water Code Section 11.085 (l)(2) ................................................................passim

Tex. Water Code Section 11.085 (v) ................................................................17

Tex. Water Code Section 11.1271 (a) ................................................................25

Tex. Water Code Section 11.1271 (e) ................................................................passim

Tex. Water Code Section 11.134 (b)(4) ................................................................26

Tex. Water Code Section 16.053................................................................38

## Rules

30 TAC Chapter 288................................................................26, 50, 59

30 TAC Section 288.5 ................................................................26, 52, 60

30 TAC Section 288.5 (1)(B) ................................................................20, 58, 64

30 TAC Section 288.5 (1)(H) ..................................................................................passim

30 TAC Section 295.9 ...........................................................................26, 50, 59

30 TAC Section 297.18 (d)(2) ...............................................................................passim

Tex. R. App. P. Section 38.1(e) ..............................................................................8

Tex. R. App. P. Section 44.1 (a) .............................................................................61

## STATEMENT REGARDING ORAL ARGUMENT

Appellee agrees with Appellants' requests for oral argument. This case involves interpretation of a statutory provision of the Texas Water Code, Section 11.085(1)(2), that is a matter of first impression in the Texas courts. There are significant nuances and intricacies of the statutory requirement, as well as Appellant TCEQ's application of it in the context of other water conservation requirements, and oral argument would aid the Court in making its decision in this precedent-setting case. *See* Tex. R. App. P. 38.1(e)

## STATEMENT OF THE CASE

This appeal by the Texas Commission on Environmental Quality ("TCEQ") and the Upper Trinity Regional Water District (the "District") comes to this Court from the Honorable Scott Jenkins of the 126th District Court of Travis County after his issuance of a Final Judgment, on March 6, 2015, reversing and remanding TCEQ's decision, as it relates to the application of Section 11.085 (l)(2), granting Water Use Permit No. 5821 (the "Permit") to the District on October 2, 2013.[1] Judge Jenkins did not reach issues not governed by Section 11.085 (l)(2), finding those issues moot in light of his reversal. The Permit as granted allows the District to construct and impound water in a proposed reservoir, Lake Ralph Hall, for recreational use and authorizes the District to divert and use the water via an interbasin transfer authorizing the District to transfer water from the reservoir in the Sulphur River Basin—the basin of origin—to the Trinity River Basin—the receiving basin. The Texas Legislature, in 1997, imposed specific additional review criteria and prerequisites for authorization of such an interbasin transfer through amendments to Section 11.085 of the Water Code. This case involves the first interpretation in a contested case context of one of those prerequisites, found in

---

[1] AR, Vol. 11, Item 151.

Section 11.085(l)(2) of the Water Code, which imposes additional water conservation requirements for interbasin transfers.

This case focuses on TCEQ's failure properly to implement the explicit statutory and regulatory water conservation prerequisites for granting the permit, including the interbasin transfer sought by the District. Although Appellee disputed various issues related to environmental impacts of the proposed project during the agency proceeding, those issues are not raised on appeal.

The contested case hearing on the merits of this matter occurred before the State Office of Administrative Hearings ("SOAH") from January 15-25, 2013.[2] Administrative Law Judges (ALJs) Kerrie Jo Qualtrough and Pratibha J. Shenoy prepared a Proposal for Decision recommending that the Commission approve the application and issue the Permit.[3] NWF filed exceptions to the Proposal for Decision[4] and a Motion for Rehearing[5] in response to the decision by the TCEQ Commissioners to grant the application.[6]

The district court ruled that TCEQ failed properly to implement the high statutory standard imposed under the Water Code for the review of water conservation plans before authorizing interbasin transfers. While NWF also

_____

[2] AR, Vols. 23-25, Items 374-382.
[3] AR, Vol. 10, Item 133.
[4] AR, Vol. 10, Item 134.
[5] AR, Vol. 11, Item 148.
[6] AR, Vol. 11, Item 151.

10

challenged TCEQ's failure to comply with its rules establishing requirements for water conservation plans for water right applications regardless of whether an interbasin transfer is involved, the district court determined those claims to be moot as a result of the reversal of TCEQ's decision on the interbasin transfer issues. The District Court's Judgment of March 6, 2015, is final and appealable. The Supreme Court of Texas ordered this case transferred on April 21, 2015 from the Third Court of Appeals.

## ISSUES PRESENTED

Pursuant to Rule 38.2(a) of the Texas Rules of Appellate Procedure, NWF objects to TCEQ's and the District's characterization of the issues presented in this appeal. NWF identifies the following issues in this appeal:

1. Did TCEQ err in its interpretation and application of Texas Water Code Section 11.085(l)(2) in finding the District's water conservation plan and implementation satisfied statutory requirements?

2. Is there substantial evidence to support TCEQ's determination that the District demonstrated that it has implemented a water conservation plan that will result in the highest practicable levels of water conservation and efficiency achievable within the District's jurisdiction as required by Texas Water Code Section 11.085(l)(2)?

3. Is there substantial evidence to support TCEQ's determination that the District's water conservation plan complied with the requirements of Sections 288.5 (1)(B) and (1)(H) of TCEQ's rules?

**A. The District submitted an application to TCEQ for Water Use Permit No. 5821 for the construction of Lake Ralph Hall and for an interbasin transfer of water from the Sulphur River Basin to the Trinity River Basin.**

In 2003, the District filed an application with TCEQ for Water Use Permit No. 5821.[7] In its application, the District sought the right to construct and maintain a dam and reservoir along the North Sulphur River, a tributary of the Sulphur River in Fannin County, Texas. The District applied for the right to impound up to 180,000 acre-feet of state-owned water in this reservoir (Lake Ralph Hall) and to divert and put to beneficial use up to 45,000 acre-feet per year of that water, of which 34,082 acre-feet per year is available on a firm basis. Additionally, the application sought authorization of an interbasin transfer allowing the transfer of up to 45,000 acre-feet of water per year of the impounded water, from the reservoir located in the Sulphur River Basin, to the Trinity River Basin where the bulk of the District's customers are and where the District asserts much of the water would be put to beneficial use.

**B. The Parties participated in a contested case hearing at State Office of Administrative Hearings.**

TCEQ received many requests for a contested case hearing on the District's application, including a number from individuals.[8] The hearing requests of NWF, the Town of Flower Mound, and the Texas Conservation Alliance were granted by

---

[7] AR, Vol. 1, Item 1.
[8] AR, Vol. 2, Item 27.

13

the TCEQ Commissioners[9] and those parties, as well as several individuals, all were determined to be affected persons and granted party status in the contested case hearing,[10] along with the Executive Director of TCEQ and the TCEQ Office of Public Interest Counsel. NWF submitted a hearing request in order to protect its substantial rights, including the rights of its members,[11] that would be affected. The individual parties withdrew their requests prior to the hearing on the merits,[12] while the Town of Flower Mound, the Texas Conservation Alliance and NWF participated in the full evidentiary SOAH hearing from January 15-25, 2013.[13] During this hearing, NWF provided evidence on and raised a number of issues, including challenges to the adequacy of the District's water conservation plan and its implementation of that plan.

ALJs Kerrie Jo Qualtrough and Pratibha J. Shenoy issued a Proposal for Decision and the parties were allowed the opportunity to file exceptions and responses.[14] The ALJs submitted their response to the exceptions to the TCEQ Commissioners.[15]

---

[9] AR, Vol. 5, Item 68.

[10] AR, Vol. 5, Item 70.

[11] NWF identified members owning land within the footprint of the reservoir that would be inundated if the reservoir were built and who shared NWF's organizational concerns. *See* AR, Vol. 5, Item 64.

[12] AR, Vol. 5, Items 59-62, 71; Vol. 6, Item 83.

[13] AR, Vol. 23, Items 374-376; Vol. 24, Items 377-379; and Vol. 25, Items 380-382.

[14] AR, Vol. 10, Item 133.

[15] AR, Vol. 11, Item 144.

14

## C. TCEQ granted the District's application for Water Use Permit No. 5821.

The Commissioners voted to grant the application and issue the Permit at their September 24, 2013 public hearing.[16] The order approving the application was issued on October 2, 2013 and mailed to the parties on October 10, 2013.[17]

NWF timely filed a Motion for Rehearing of this matter on October 31, 2013.[18] TCEQ made no ruling on the Motion for Rehearing and it was overruled by operation of law on November 27, 2013.[19] NWF timely filed its Original Petition in this matter on December 26, 2013.

## D. District Court determined that TCEQ erred in granting the District's permit due to lack of compliance with Water Code Section 11.085 (l)(2).

Judge Scott Jenkins, for the 126th District Court of Travis County, held that TCEQ had not met statutory requirements before issuing the permit authorizing an interbasin transfer under Water Code Chapter 11.085 (l)(2) and reversed and remanded that portion of the Final Order back to TCEQ. NWF's appeal also raised the issue of TCEQ's failure to comply with its rules regarding water conservation plans even in the absence of an interbasin transfer. However, based on the ruling that TCEQ had not complied with Section 11.085 (l)(2), all other claims were deemed moot. The District Court's Judgment of March 6, 2015, is final and appealable. The

---

[16] AR, Vol. 26, Item 384.
[17] AR, Vol. 11, Item 151.
[18] AR, Vol. 11, Item 148.
[19] AR, Vol. 11, Item 150.

Supreme Court of Texas ordered this case transferred on April 21, 2015 from the Third Court of Appeals.

# SUMMARY OF THE ARGUMENT

This case presents the first consideration in a contested case hearing context of the requirements of Section 11.085 (l)(2) of the Water Code, which allows for the granting of an application for an interbasin transfer[20] only upon satisfaction of what is by far the most stringent water conservation language in Texas law. Pursuant to that provision, TCEQ is only allowed to grant an application involving an interbasin transfer if the applicant has developed and implemented a water conservation plan that will result in the highest practicable levels of water conservation and efficiency achievable within the applicant's jurisdiction. TCEQ applied that requirement in a manner that deprived the statute of its plain meaning and of any practical effect.

All water right applications are subject to a requirement for the development of a water conservation plan, which must include quantified conservation goals and measures to achieve those goals. Those plans must provide for a reasonable level of water conservation. The plain language of Section 11.085 (l)(2) imposes additional, and very stringent, water conservation requirements for applications involving interbasin transfers such as the one at issue here. In 2003, the Legislature directed TCEQ, in partnership with the Texas Water Development Board, to develop model

---

[20] As set out in Section 11.085 (a) of the Water Code, an interbasin transfer involves taking or diverting water from one river basin in the state and transferring the water to any other river basin. As provided by Section 11.085 (v), some interbasin transfers are exempted from most of the requirements of Section 11.085. The transfer at issue here does not qualify for that exemption.

17

conservation programs that suggest best management practices, also known as BMPs, for achieving the highest practicable levels of water conservation and efficiency achievable. TCEQ has not done so and has not developed rules or guidance interpreting Section 11.085 (l)(2).

Instead, TCEQ relied on another document developed by a volunteer task force for a different purpose to guide its application of that statute. It did so even though the task force, on which the Executive Director of TCEQ served, expressly stated that the document, known as Report 362 or the BMP Guide, was not intended as a regulatory document and not intended to inform compliance with the interbasin transfer water conservation requirement. Instead, it is intended as a resource describing commonly used best management practices for water conservation from which users are encouraged to pick and choose components to incorporate in developing routine water conservation plans and recommendations. Report 362 is a voluntary guide that includes a single, multi-component best management practice designed for wholesale water providers like the District.

Relying on the voluntary nature of the document, TCEQ allowed the District to pick and choose components of that single best management practice to include in its water conservation plan. The District provided no explanation or justification for failing to include various components of that BMP in its plan. Indeed, the District did not even retain a water conservation expert to help it develop a water

18

conservation plan to comply with that stringent criterion. Moreover, the water conservation plan does not specify the level at which various conservation measures are to be included. Thus, for example, the District's program to provide irrigation system evaluations includes no indication of the level of effort or amount of evaluations proposed to be undertaken.[21] In effect, under TCEQ's approach, an evaluation of a single irrigation system is credited the same as an evaluation of 10,000 irrigation systems in assessing compliance with the "highest" practicable levels of water conservation and efficiency achievable. Despite the statutory directive, TCEQ never attempted to determine the highest practicable levels of water conservation and efficiency achievable within the District's jurisdiction or the adequacy of the District's plan to accomplish those levels.

TCEQ also failed to review the District's implementation of its water conservation plan, as required by Section 11.085 (l)(2). The only review of the adequacy of actual implementation was undertaken by NWF's water conservation expert, who determined that the implementation reports available from the District did not indicate implementation of key components of the plan and certainly did not document implementation demonstrating that the plan "will result" in the highest practicable levels of water conservation and efficiency achievable. The record is also

---

[21] AR, Vol. 18, Item 239 at p. 13, Section 5.8. Actually, the plan describes what an evaluation "could" consist of rather than a commitment to any actual program. *Id.*

19

devoid of evidence demonstrating the level at which the water conservation plan will be implemented in the future.

The District's water conservation plan also fails to comply with even the limited explicit water conservation requirements that are applicable for all water right applications. First, the District's plan fails to provide any description or explanation of a means for enforcement, which is a specific requirement of TCEQ's rules and critically important for successful implementation. Second, although the District's plan does include numerical goals to be achieved, it fails to provide the explanation of the basis for the development of those goals that is required by TCEQ's rules and is necessary to evaluate the reasonableness of the goals.

TCEQ's treatment of Section 11.085 (l)(2) deprives that provision of any independent meaning and is arbitrary and capricious and an abuse of discretion. In addition, TCEQ's findings of compliance with Section 11.085 (l)(2), and 30 TAC §§288.5 (1)(B) and (1)(H) are not supported by substantial evidence. A key question in this appeal is whether the Legislature's explicit prerequisite to the granting of an interbasin transfer will be given meaningful effect. TCEQ, in its decision process in this matter, rendered it ineffectual. In addition, TCEQ failed to follow its own regulations regarding contents of water conservation plans accompanying applications for water rights, resulting in a decision that is arbitrary and capricious, an abuse of discretion, and is not supported by substantial evidence.

## ARGUMENT

**A. Standard of Review:**

The scope of judicial review of a state agency decision in a contested case is as provided by the law under which review is sought.[22] If, as is true here, the underlying statute does not prescribe the standard of review, the substantial evidence rule applies. The "Texas Water Code does not define the scope of judicial review of a decision of the TCEQ, and thus [the court] review[s] under the 'substantial evidence' standard." *Nadaf v. Texas Comm'n on Environmental Quality*, No. 04-13-00068-CV (Tex. App. 2014). According to the substantial evidence standard, the court:

"...

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

   (A) in violation of a constitutional or statutory provision;

   (B) in excess of the agency's statutory authority;

   (C) made through unlawful procedure;

   (D) affected by other error of law;

---

[22] Tex. Gov't Code Section 2001.172

21

(E) not reasonably supported by substantial evidence considering the

reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or

clearly unwarranted exercise of discretion."[23]

For purposes of evaluating the existence of substantial evidence under Texas

law, "in conducting a substantial-evidence review, [the Court] must determine

whether the evidence as a whole is such that reasonable minds could have reached

the conclusion the agency must have reached in order to take the disputed action."[24]

The Third District Court of Appeals in Austin has elaborated on the arbitrary

and capricious prong of review under Texas Government Code Section 2001.174(2)

(F):

> "An agency's decision is arbitrary and capricious or results from an
> abuse of discretion if the agency: (1) failed to consider a factor that the
> legislature directs it to consider; (2) considers an irrelevant factor; or
> (3) weighs only relevant factors that the legislature directs it to consider
> but still reaches a completely unreasonable result. *City of El Paso v.
> Public Util. Comm'n,* 883 S.W.2d 179, 184 (Tex. 1994). Other reasons
> an agency's decision might be considered arbitrary is if its order denies
> parties due process of law or the agency fails to follow the clear
> unambiguous language of its own regulations. *Reliant Energy, Inc v.
> Public Util. Comm'n,* 153 S.W. 3d 174, 199 (Tex. App – Austin 2004,
> pet. denied)."[25]

---

[23] Tex. Gov't Code Ann. Section 2001.174(2)

[24] *City of El Paso v. Public Utility Commission of Texas,* 839 S.W.2d 895, 905-6 (Tex.App. – Austin 1992). Relevant portion affirmed by *City of El Paso v. Public Util. Comm'n,* 883 S.W.2d 179 (Tex. 1994).

[25] *State of Texas' Agencies and Institutions of Higher Learning et al v Public Utility Commission of Texas et al,* 450 S.W.3d 615, 625 (Tex. App. – Austin 2014).

**B. TCEQ erred by approving issuance of the permit in the absence of a water conservation plan meeting the explicit statutory prerequisites of Section 11.085 (l)(2) of the Water Code.**

**1. Section 11.085 (l)(2) establishes an unambiguous and stringent prerequisite to approval of an interbasin transfer.**

TCEQ impermissibly translated the explicit, and unambiguous, statutory prerequisite to approval of an interbasin transfer into a standardless exercise, allowing the District to pick and choose water conservation measures to include in its water conservation plan without requiring it to justify those decisions or to demonstrate that the plan would result in the required levels of water conservation and efficiency.[26] TCEQ's decision to approve the application was not supported by substantial evidence, was arbitrary and capricious, an abuse of discretion and otherwise not in compliance with law.[27] The plain language of Section 11.085 (l)(2) of the Water Code establishes a stringent, mandatory prerequisite for approval by TCEQ of an interbasin transfer, such as the one at issue here:

"The commission may grant, in whole or in part, an application for an interbasin transfer only to the extent that:

. . .

---

[26] Various water conservation plans were submitted by the District. The most recent one, and the one on which the District primarily seeks to rely, and the only one in effect at the time of the hearing, is the 2012 plan. AR, Vol. 18, Item 239. The District also submitted a 2009 Water Conservation Plan as part of its application. AR, Vol. 18, Item 236. The 2012 plan is the version that comes closest to meeting statutory and regulatory prerequisites and this brief addresses the adequacy of that plan except to the extent that specific references to the 2009 plan are indicated. NWF's arguments of inadequacy apply to both versions of the plans and also to earlier versions referenced in the application.

[27] This issue was raised in NWF's Motion for Rehearing at pp. 3 – 8, pp. 9 – 10 (FOF 383-384, FOF 438-439), pp. 10 -13 (FOF 441-448), pp. 13 – 15 (COL 20, COL 27 – 29, COL 32-33).

(2) the applicant for the interbasin transfer has prepared a drought contingency plan and has developed and implemented a water conservation plan that will result in the highest practicable levels of water conservation and efficiency achievable within the jurisdiction of the applicant."

There are no TCEQ rules or guidance interpreting this provision.[28] As the Texas Supreme Court has directed, each word should be given effect according to its plain meaning. *City of Marshall v. City of Uncertain*, 206 S.W.3d 97, 105 (Tex. 2006)("We look first to the plain and ordinary meaning of the statute's words." citing *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003)). Every word is to be given effect. *Id.* (citing *Old Am. County Mutual Fire Ins. Co. v. Sanchez*, 149 S.W.3d 111, 115 (Tex. 2004) and *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003)).

The Merriam-Webster online dictionary defines practicable as "capable of being put into practice or of being done or accomplished."[29] Similarly, the online Merriam-Webster thesaurus defines "achievable" as "capable of being done or carried out."[30] Although the definitions of the two terms are very similar, in the

---

[28] AR Vol. 25, Item 380 (hearing transcript for Jan.23, 2013) at p.1633, line 14 – p. 1634, line 2. TCEQ has adopted a rule that basically restates the statutory requirement. 30 TAC §297.18 (d)(2) provides, in relevant part: "the applicant for the interbasin transfer has prepared drought contingency and water conservation plans meeting the requirements of Chapter 288 of this title (relating to Water Conservation Plans, Drought Contingency Plans, Guidelines and Requirements) and has implemented a water conservation plan that will result in the highest practicable levels of water conservation and efficiency achievable within the jurisdiction of the applicant."

[29] Merriam-Webster, http://www.merriam-webster.com/dictionary/practicable (last visited July 26, 2015).

[30] Merriam-Webster, http://www.merriam-webster.com/thesaurus/achievable (last visited July 26, 2015).

24

context of the statute, they each have independent effect. Taken as a whole, Section 11.085 (l)(2) establishes that an acceptable water conservation plan must include measures that are designed to result in the highest levels of water conservation and efficiency which are capable of being accomplished—i.e., highest practicable. However, an applicant may be able to show that it is not required to include in its plan every practicable measure or to include them at the highest level if it demonstrates that a measure or level is not capable of being done or carried out—i.e., achievable—within the jurisdiction of the applicant.

The plain language of the provision also requires more than a showing that such a plan has been <u>developed</u>. There must also be a showing that the plan has been <u>implemented</u> and that the plan as implemented <u>will result</u> in achieving the requisite levels of conservation and efficiency. The statute does not purport to require that the highest practicable levels of water conservancy and efficiency achievable must have already been reached before an application is granted. The plain language does, however, require a showing, given the existing, and ongoing, implementation of the plan, that those levels <u>will</u> be accomplished.

The statute imposes that stringent water conservation and efficiency performance standard as an additional requirement over and above less stringent water conservation requirements that apply more broadly. Section 11.1271 (a) of the Water Code requires that all applicants for a water right, regardless of whether an

25

interbasin transfer is involved, must formulate and submit a water conservation plan and adopt reasonable water conservation measures. In addition, Section 11.134 (b)(4) of the Water Code provides that a water right application can only be granted if the applicant provides evidence that it will use reasonable diligence to avoid waste and achieve water conservation. TCEQ has adopted rules to implement those basic water conservation requirements.[31] As explained by Mr. Gooch, the District's water conservation expert witness, rather than imposing substantive standards, the rules implementing those two provisions, with limited exceptions, primarily require only that water conservation plans must address certain issues instead of imposing a specific substantive standard for water conservation measures or efficiency that must be met.[32] The plain language of Section 11.085 (l)(2) stands in sharp contrast to the general requirements for "reasonable" measures and "reasonable" diligence.

In order to give independent meaning to Section 11.085 (l)(2), a standard for a water conservation plan that is much more stringent than reasonable diligence must be enforced. In derogation of that clear legislative directive, TCEQ granted the

[31] Those rules are found in 30 TAC Chapter 288 and Section 295.9. The Chapter 288 rules specifically applicable to wholesale water providers such as the District are found in Section 288.5. Chapter 288 requirements are also expressly made applicable, through 30 TAC Section 297.18 (d)(2), to applicants seeking an interbasin transfer.

[32] "I believe that the 2009 UTRWD Water Conservation Plan addresses each of the issues that are specified in the applicable TCEQ rules, and I believe the District's plan therefore satisfies TCEQ's requirements." AR, Vol. 18, Item 11 (Direct testimony of Tom Gooch) at p. 68, line 4 – p. 69, line 15. As discussed further below, Mr. Gooch was unable to point to any basis for asserting that requirements had been met for a description of enforcement mechanisms or for the basis of numerical goals.

District's application for an interbasin transfer based on a water conservation plan that fails to satisfy the rules governing even that reasonable diligence level of water conservation and that fails to comply with the plain language of the statute. TCEQ did so by relying, at the District's behest, on a document called the Water Conservation Best Management Practices Guide (also known as the BMP Guide or Report 362), which is a voluntary guidance document designed for use outside of the regulatory context to inform the development of routine water conservation programs. Based on the language of Report 362, TCEQ allowed the District to pick and choose measures from Report 362 to include in its plan, without justifying the exclusion of measures or the extent to which measures are included. TCEQ relied on Report 362 instead of adopting rules or producing the model water conservation plans the Legislature directed TCEQ to develop to help inform the implementation of Section 11.085 (l)(2) and without making a reasoned evaluation of the highest practicable levels achievable.

The District also failed to undertake a review of the highest practicable levels achievable, failing even to retain, among the many technical experts working on the application, a water conservation expert to help it develop its water conservation plan and program.[33] The District did retain a water conservation expert to testify in

---

[33] AR, Vol. 23, Item 374 (hearing transcript for Jan. 15, 2013) at p. 44, line 12 – p. 47, line 14.

27

defense of its plan and water conservation program after it was developed.[34] He

acknowledged that he did not evaluate potential additional conservation measures

the District might undertake beyond those included in its water conservation plan.[35]

### 2. TCEQ ignored the plain language of Section 11.085 (l)(2) and allowed the District to choose what levels of conservation and efficiency to include.

The Legislature's intent in establishing a strong requirement is reflected both

in the language chosen to define the test and in its decision to make compliance an

explicit prerequisite to approval of an application. In amending Section 11.085 in

1997, the Legislature imposed a significant review process for interbasin transfers.

However, most subsections of Section 11.085 direct TCEQ to <u>consider</u> various

factors in reaching a decision about whether to approve an application. By contrast,

in Subsection (l) the Legislature imposed two explicit prerequisites to approval. Only

the second of those—Subsection (l)(2)—is at issue in this appeal.

Subsection 11.085 (l)(2) imposes a three-part test. First, the applicant must

have prepared a drought contingency plan, which imposes measures to reduce water

use during drought conditions over and above the water conservation and efficiency

measures that are in effect at all times. Compliance with that drought contingency

component is not challenged in this appeal. Second, the applicant must have

developed a water conservation plan strong enough that, if implemented, it <u>will</u>

---

[34] AR, Vol. 24, Item 377 (hearing transcript for Jan. 18, 2013) at p. 863, line 23 – p. 864, line 4.

[35] AR, Vol. 24, Item 377 (hearing transcript for Jan. 18, 2013) at p. 889, line 23 – p.890, line 3.

28

result in the highest practicable levels of water conservation and efficiency achievable within the applicant's jurisdiction. The third component requires the applicant to demonstrate that it has implemented the water conservation plan in a way that will result in the highest practicable levels of water conservation and efficiency achievable. The issue of inadequate implementation of the District's water conservation plan is addressed under heading C, below.

As acknowledged by TCEQ's water conservation witness, TCEQ has not adopted any policy or guidance that informs the interpretation of the water conservation requirements for interbasin transfers.[36] That is true even though the Legislature, in 2003, expressly directed TCEQ, in partnership with the Texas Water Development Board, to "develop model water conservation programs for different types of water suppliers that suggest best management practices for achieving the highest practicable levels of water conservation and efficiency achievable for each specific type of water supplier." Section 11.1271 (e), Water Code.[37] Although such model programs might not define precisely what is required to comply in each

---

[36] AR Vol. 25, Item 380 (hearing transcript for Jan. 23, 2013) at p.1633, line 14 – p. 1634, line 2. TCEQ has adopted a rule that basically restates the statutory requirement. 30 TAC §297.18 (d)(2) provides: "the applicant for the interbasin transfer has prepared drought contingency and water conservation plans meeting the requirements of Chapter 288 of this title (relating to Water Conservation Plans, Drought Contingency Plans, Guidelines and Requirements) and has implemented a water conservation plan that will result in the highest practicable levels of water conservation and efficiency achievable within the jurisdiction of the applicant."

[37] That requirement was imposed in H.B. 2660, Chapter 688, 78th Legislature Regular Session 2003. The agencies were directed to complete that task by September 1, 2004. Id. at SECTION 6.

particular circumstance, they would provide relevant guidance regarding conservation plans specifically designed to result in the highest practicable levels of water conservation and efficiency achievable.

In the absence of the model conservation programs required by Section 11.1271 (e) or other guidance defining compliance with 11.085 (l)(2), TCEQ erroneously relied on Report 362, which was prepared by a volunteer Water Conservation Implementation Task Force ("Task Force") in response to an entirely different legislative directive and for a different purpose, as establishing the standard.[38] As the attorney representing the Executive Director in this matter explained to the TCEQ commission when he was asked about NWF's contention that Report 362 is not appropriately used as the guide for highest practicable levels of water conservation and efficiency achievable: "if that guide isn't that, then one doesn't exist. It is the only statement, by either this Commission or the Water Development Board, that directs any form of best management practice for water conservation."[39]

---

[38] Senate Bill 1094, enacted in 2003, established the Water Conservation Implementation Task Force and charged it with six enumerated duties and directed it to "develop a best management practices guide for use by regional water planning groups and political subdivisions responsible for water delivery service" and to make a final report. Although developed by the Task Force, Report 362 was published by the Texas Water Development Board.

[39] AR, Vol. 26, Item 384, CD recording of TCEQ Sept. 24, 2013 Agenda Session. An unofficial transcript of that portion of the agenda session is included in the Appendix.

Simply put, he is correct: no guide for highest practicable levels of water conservation and efficiency achievable exists because TCEQ failed to implement the explicit directive of Section 11.1271 (e) of the Water Code and has not adopted rules or other guidance elaborating on the requirements of Section 11.085 (l)(2). However, that failure does not make Report 362 an acceptable substitute, and it was arbitrary and capricious and an abuse of discretion for TCEQ to apply a voluntary guide developed for an entirely different purpose in the manner done here. There simply is no defensible construction of the language of Section 11.085 (l)(2) that countenances allowing an applicant to pick and choose which reasonably available measures to include and at what level without requiring a justification for the decisions in terms of the impact on the levels of water conservation and efficiency that would result. NWF has not argued that Report 362 is irrelevant to the inquiry, but, rather, that it is not sufficient as a test of compliance.

### 3. Report 362 is not an adequate test for compliance with Section 11.085 (l)(2)

In 2004, the Task Force expressly addressed the appropriateness of using Report 362 in the way TCEQ has chosen to do: "The Task Force understands that a question has arisen as to how the BMP Guide might relate to the water conservation criteria to be used by TCEQ in reviewing and acting on applications for interbasin transfers of surface water. ... The Task Force is not attempting through the BMP

31

Guide or the water conservation targets or goals to make that determination."[40] The

Task Force also explained that "[t]he BMP Guide is not a regulatory document."[41]

Both the Executive Administrator of the Texas Water Development Board at the

time (Kevin Ward) and the Executive Director of TCEQ at the time (Glenn Shankle)

were members of the Task Force that concluded Report 362 was not intended to

serve as the water conservation criterion for approval of interbasin transfers or as a

regulatory document.[42]

The Legislature also signaled its intention that Report 362 would not be an

appropriate substitute for the model water conservation programs required under

Section 11.1271 (e). The development of Report 362 was mandated by the

Legislature pursuant to S.B. 1094, which was reported as enrolled on May 6, 2003.[43]

On May 30, 2003, H.B. 2660, which added Section 11.1271 (e) directing TCEQ and

---

[40] AR, Vol. 19, Item 269, (Special Report) at pp. 17-18. TCEQ, in its brief, at p. 31, cites to a portion of an updated version of Report 362, which was developed after the hearing and is not in the record, contending that the successor entity to the Task Force has confirmed the connection between Report 362 and H.B. 2660. Even if it were in the record and could be considered, the revision does not actually indicate anything about Report 362 addressing the requirements of Section 11.1271 (e), or highest practicable levels of water conservation and efficiency, or interbasin transfers. The Task Force charge discussed in the update, as it relates to Report 362, comes from S.B. 1094. In addition, that introduction accompanies a revised version of Report 362, including a revised BMP for wholesale water providers, and not the version considered in the hearing. The relationship between H.B. 2660 and S.B. 1094 is discussed in the text accompanying footnotes 43 and 44.

[41] *Id.* Item 269 at p. 15.

[42] *Id.* Item 269 at pp. 75 and 77.

[43] S.B. 1094, 2003 Leg., 78(R) Sess. (Tx. 2003), *available at* http://www.capitol.state.tx.us/tlodocs/78R/billtext/pdf/SB01094F.pdf#navpanes=0. Date reported enrolled *available at* http://www.capitol.state.tx.us/BillLookup/Actions.aspx?LegSess=78R&Bill=SB1094.

TWDB to develop those model conservation programs, was reported as enrolled.[44]

If the Legislature had intended that Report 362 could be used to define highest

practicable levels of water conservation and efficiency achievable, there would have

been no reason to enact Section 11.1271 (e). Acceptance of TCEQ's interpretation

would impermissibly deprive Section 11.1271 (e) of independent effect. *Texas

Workers' Comp. Comm'n v. Cont'l Cas. Co.*, 83 S.W.3d 901, 905 (Tex. App. – Austin

2002) (Statutes are interpreted by considering the entire statute, not just disputed

provisions. Disputed provisions are to be considered in context, not in isolation.

Courts consider such things as the circumstances under which the statute was

enacted, former statutory provisions on the same or similar subjects, and the

consequences of a particular construction when interpreting statutes. We do not give

one provision an interpretation that is inconsistent with the other provisions of the

act.)(Internal citations omitted)

NWF's water conservation expert, Chris Brown, served as one of the

consultants drafting Report 362,[45] and he testified that the consultants involved in

---

[44] H.B. 2660, 2003 Leg., 78(R) Sess. (Tx. 2003), *available at*
http://www.capitol.state.tx.us/tlodocs/78R/billtext/pdf/HB02660F.pdf#navpanes=0. Date
reported enrolled *available at*
http://www.capitol.state.tx.us/BillLookup/Actions.aspx?LegSess=78R&Bill=HB2660.
[45] AR, Vol. 22, Item 357 (direct testimony of Chris Brown) at pp. 11-12. Contrary to the
District's negative characterization of Mr. Brown's qualifications, not only was he chosen to
help write Report 362 but he has worked extensively on water conservation issues in Texas both
in developing and directing water conservation programs for the San Antonio Water System and
as a consultant for a number of water suppliers. In addition, his more recent work in California

33

that process were never directed to identify the highest practicable levels of water conservation and efficiency achievable.[46] That testimony was undisputed. He also testified that, although relevant as a starting point for identifying potential water conservation measures, the best management practices in Report 362 do not represent the highest practicable levels of water conservation and efficiency achievable because, among other things, Report 362 represented an effort to achieve consensus of the Task Force members in identifying widespread practices commonly used in 2004 that might be considered for voluntary implementation. Mr. Gooch, the District's water conservation witness, acknowledged that he knew of no language in H.B. 2660, S.B. 1094, or in Report 362 indicating that the best management practices in Report 362 are adequate to achieve the highest practicable levels of water conservation and efficiency achievable.[47] Because of the purpose for which it was prepared, Report 362 heavily stresses its voluntary nature, allowing users to pick and choose measures to implement. TCEQ compounded the error of relying on Report 362 as a substitute for determining the highest practicable levels of water conservation and efficiency achievable by using that voluntary aspect to excuse the District's failure even to incorporate in its water conservation plan many of the

includes significant involvement in development and implementation of water conservation plans, including best management practices (BMPs). *Id.* at p. 6, line 13 – p. 10, line 6.

[46] *Id.* at p 14.

[47] AR, Vol. 24, Item 377 (hearing transcript for Jan. 18, 2013) at p. 915, lines 3 – 13.

relevant measures recommended in Report 362 or to justify their exclusion. Relying on Report 362 in this manner deprives the term "highest" in Section 11.085 (l)(2) of meaning. The arbitrariness of relying on Report 362 to define the standard for regulatory compliance with the highest practicable levels of water conservation and efficiency achievable is further illustrated by the explicit acknowledgement in the Report that "[t]he BMPs are not exclusive of other meaningful conservation techniques that an entity might use in formulating a state-required water conservation plan."[48]

The plain language of Section 11.085 (l)(2) precludes the use of a voluntary approach that defers to an applicant to pick and choose what level of conservation to provide, particularly an approach that does not require the applicant to justify its decision to omit potentially applicable measures. TCEQ's use of Report 362 in this manner deprived the plain language of Section 11.085 (l)(2) of practical effect. TCEQ never actually evaluated the highest practicable levels of water conservation and efficiency achievable within the District's jurisdiction, as the Legislature directed it to do, to see if the District's plan met that standard. Instead, TCEQ just looked at Report 362 and reviewed the recommended measures in the Region C Water Plan.[49] However, as discussed below, many of the conservation measures

---

[48] AR, Vol. 22, Item 368, (excerpt from Report 362), at p. 4.
[49] AR, Vol. 25, Item 380 at p. 1638, line 2 – 24.

included in those two documents actually are missing from the District's plans, without justification.

Not only did the District fail to provide any justification for its failure to include many of the measures listed in Report 362 or the Region C Water Plan, as discussed below, the enforcement component essential for showing even a reasonable diligence level of water conservation is missing. That component is mandated by TCEQ's rules and also called for in Report 362.[50] Mr. Brown characterized the District's water conservation plan as weak explaining that it lacks specific programs for the District's customers to implement, lacks specificity, is not adequately funded and that, because, in many instances, it merely encourages its customers to take various measures, the measures are unenforceable and can't be counted on.[51] There is only one best management practice—BMP 2.14—in Report 362 that is directed specifically at wholesale water providers like the District. The consideration of Report 362 in the hearing focused on that single BMP. BMP 2.14 has numerous subparts and the District's water conservation plan fails to include many of the measures called for in those subparts. Although drafted as voluntary guidance, the BMP notes that "[t]o implement this BMP, the following elements and

---

[50] 30 TAC Section 288.5 (1)(H). Report 362 also recommends the adoption of penalties as a means to enforce implementation. AR, Vol. 22, Item 368, (Exh. NWF 9; excerpt from Report 362), at p. 79, in Item 4.

[51] AR, Vol. 22, Item 357 (direct testimony of Chris Brown) at p. 22 – p. 29, line 5.

strategies should be included" and then lists specific content,[52] much of which is missing from the District's plan. The District provided no justification for those omissions. For example, Item 2 of BMP 2.14, on page 79, references the need for a plan to include quantified five and ten-year targets and the basis for the development of those targets, which are also referred to as goals. Although the District's plan does include such goals, as its water conservation witness acknowledged, the basis for the development of the five and ten-year goals is missing from the District's plans.[53] Item 4 in BMP 2.14 indicates the wholesale agency should consider developing and adopting some form of penalties for non-compliance with the requirement that its wholesale customers implement adequate water conservation plans. No such penalties, or similar compliance incentives, are identified or discussed in the District's plan.[54]

Item 6 in BMP 2.14 has six subparts. Mr. Gooch testified that with respect to subpart 6.c., which refers to development of procedures for calculating program savings, costs and benefits, he didn't know if the District had the referenced procedures.[55] With respect to 6.d., which relates to conservation incentive activities such as pooling funds to purchase ultra-low-flush toilets, he didn't know if the

[52] AR, Vol. 22, Item 368 (excerpt from Report 362), at p. 78, in Item C.
[53] AR, Vol. 24, Item 377 (hearing transcript for Jan. 18, 2013) at p. 919, line 24 - p. 923, line 25.
[54] AR, Vol. 24, Item 377 (hearing transcript for Jan. 18, 2013) at p. 924, line 1 - p. 925, line 2.
[55] AR, Vol.24, Item 377 (hearing transcript for Jan. 18, 2013) at p. 928, line 25 – p. 929, line 3.

District coordinated any conservation incentive activities.[56] Regarding item 6.f., he didn't know about any rebates and stated that he wasn't sure what a retrofit program was.[57] Mr. Gooch also indicated he didn't know if copies of progress reports of BMPs implemented by wholesale customers were collected in accordance with item F.4).[58] Nothing in the District's water conservation plan addresses any of those issues. Mr. Brown also testified about other aspects of BMP 2.14 that are missing from the District's plan.[59]

### 4. The Region C Water Plan conservation recommendations do not justify reliance on Report 362 or demonstrate compliance with Section 11.085 (l)(2)

TCEQ also sought to justify its reliance on Report 362 by referring to the water conservation discussion in the regional water plan for Region C.[60] That effort was supported by District's water conservation witness, Mr. Gooch, who served as the project manager for the consultant team involved in developing the Region C plan and as the person primarily responsible for developing the language of the

---

[56] *Id.* at p. 929, lines 4-7.

[57] *Id.* at p. 929, lines 8-16.

[58] *Id.* at p. 929, line 21-p. 930, line 1.

[59] AR, Vol. 22, Item 357 (direct testimony of Chris Brown) at p. 23, line 1 – 21 (additional missing aspects include guidelines for customer ordinance components, specific reporting requirements, and a schedule and scope for the programs that are included).

[60] Region C is the region in which both the proposed reservoir, which is proposed to be built in the Sulphur River Basin, and the District's service area, which is primarily in the Trinity River Basin, are located. The Administrative Law Judges took official notice of the 2011 Region C Water Plan, which was the current plan at the time of the hearing. The basic statutory provision creating the regional water planning process is Section 16.053 of the Water Code. Section 16.053 (a) provides a general overview of the charge to regional water planning groups in developing regional water plans.

plan.[61] The language of the Region C Water Plan stating the contention that Report 362 fulfills the directive of Section 11.1271 (e) of the Water Code matches Mr. Gooch's testimony.[62] However, that is an issue of statutory interpretation, which is a question of law, not one of fact. See *Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex. 1989). Accordingly, neither the Region C Water Plan nor Mr. Gooch's testimony to that effect have probative value on the issue.

The Legislature, in another subsection of Section 11.085, expressly dictated the role of water conservation recommendations in the relevant regional water plan when TCEQ is considering an interbasin transfer of water. Section 11.085 (k)(2)(c) of the Water Code directs the Commission, when determining whether to authorize an interbasin transfer, to consider factors in the relevant regional water plans addressing "proposed methods and efforts by the receiving basin to avoid waste and implement water conservation and drought contingency measures." (Emphasis added.)[63]

Thus, the adequacy of recommendations of the Region C Water Plan about proposed methods and levels of efforts to avoid waste and implement water conservation and drought contingency measures throughout the receiving basin was

---

[61] AR, Vol. 24, Item 377 (hearing transcript for Jan. 18, 2013) at p.933, line 20 – p. 934, line 21.
[62] AR, Vol. 22, Item 368 (Section 6 of 2011 Region C Water Plan) at p. 6.47: "The TWDB and TCEQ have addressed this [Section 11.1271 (e)] requirement by preparing TWDB Report 362, the *Water Conservation Best Management Practices Guide*." Mr. Gooch stated the same opinion. AR, Vol. 18, Item 218 (direct testimony of Tom Gooch) at p. 79, lines 1 – 9.
[63] Region C is the proposed receiving basin for this interbasin transfer.

one of the factors the Commission was required to consider in reviewing whether the application should be granted. In directing that review, the Legislature recognized that it may not be appropriate to allow state-owned water to be taken from another basin if the receiving basin is allowing water to be wasted or is otherwise not implementing adequate water conservation and drought contingency measures. However, that is a separate consideration from whether the drought contingency plan and the water conservation plan developed by the District, and its implementation of that plan, meet the requirements of Section 11.085 (l)(2). Neither the Water Code nor any TCEQ rule indicates that a regional water plan is to be looked to in defining what levels of water conservation and efficiency would be adequate to meet the requirements of Section 11.085 (l)(2). And, regardless, the test used must give full effect to the statutory language.

A comparison of the Region C Water Plan water conservation recommendations to the District's water conservation plan does serve to further illustrate the failure of the District's plan to comply with Section 11.085 (l)(2). Although merely including all of the water conservation measures recommended in the Region C Water Plan in the District's water conservation plan would not demonstrate compliance with that standard,[64] the complete absence of some

---

[64] There has been no showing that the conservation measures recommended in the Region C Water Plan are sufficient to result in the highest practicable levels of water conservation and efficiency achievable within any particular entity's jurisdiction. For example, the plan merely

measures that are recommended for implementation by other water suppliers, or, at minimum, the absence of a justification for excluding such measures, does further demonstrate that the plan falls short of one that will result in the highest practicable levels of water conservation and efficiency achievable. Under any reasonable test for compliance with that statutory standard, the failure to incorporate widely recommended measures, or show why they are not appropriate for inclusion, represents a fatal flaw. The District's water conservation plan fails to include two of the specific water conservation measures—a coin-operated clothes washer rebate program and landscape irrigation restrictions—that are recommended in the Region C Water Plan for implementation by a large number of water suppliers across the region. The vast majority of those water suppliers are not seeking to authorize interbasin transfers of water and are not subject to the heightened water conservation standards of Section 11.085 (l)(2) .

The 2011 Region C Water Plan recommends two tiers of water conservation measures applicable for municipal use, which is the predominant type of use currently supplied by the District and one of three types of uses requested for approval in the Permit that is the subject of this lawsuit.[65] As Mr. Gooch testified on

---

lists certain conservation measures and does not specify the levels at which measures would need to be implemented. The plan also acknowledges that water conservation measures were studied only at the regional level and that more detailed studies for individual suppliers might indicate different results. AR, Vol. 22, Item 368 at p. 6.49. Again, that individualized review of highest practicable levels achievable is missing.

[65] AR Vol 22, Item 367 (excerpt from 2011 Region C Water Plan) at pp. 6.47-6.49.

behalf of the District, the 2011 Region C Water Plan recommends a "basic" tier of seven conservation measures for each municipal entity that has a demand greater than supply and has a gallons-per-capita-per-day use greater than 140.[66] Other than educational programs and a conservation rate structure, the basic tier consists of measures that quantify savings anticipated from implementation of legal requirements that are imposed under existing law without action by the water supplier.[67]

The "expanded" tier of five measures, which includes items requiring more effort by the water supplier, is recommended for 145 out of 277 water user groups.[68] One of the measures included in that tier is a coin-operated clothes washer rebate program designed to get more efficient washers installed in commercial laundries. As Mr. Gooch acknowledged, the District's water conservation plan has no such rebate program and he is not aware of any reason that would prevent it from having one.[69] Mr. Brown, NWF's water conservation expert, confirmed the absence of any rebate programs in the District's plan; explained the importance of rebate programs, as part of a financial assistance program, in achieving effective water conservation; and indicated the critical role wholesale water providers can play in implementing

---

[66] AR Vol. 24, Item 377 (hearing transcript for Jan. 18, 2013) at pp. 881-84.
[67] *Id.*
[68] *Id.* at p. 885, lines 7 -15.
[69] Id. at p. 885, line 19 – p. 886, line 9.

them.[70] Rebate programs are one of the specific elements listed in BMP 2.14 in Report 362.[71]

A second measure included in that expanded tier of the 2011 Region C Water Plan is landscape irrigation restrictions. Although the District's 2012 water conservation plan does "urge" its customers to include time of day and day of week landscape watering strategies in their water conservation plans, the District has not made landscape irrigation restrictions a required component of its conservation plan.[72] That is true even though the District is contractually obligated to implement a water conservation program that is at least as stringent as the City of Dallas' program, which does include mandatory time of day and day of week restrictions.[73]

## C. TCEQ erroneously approved the District's application even though the District has not demonstrated that it has implemented its water conservation plan as required by Section 11.085 (l)(2) of the Water Code.

A second prerequisite established in Section 11.085 (l)(2) for granting an application for an interbasin transfer is that the applicant must have implemented its water conservation plan in a way that will result in the highest practicable levels of water conservation and efficiency achievable within the jurisdiction of the applicant.

---

[70] AR, Vol. 22, Item 357 (direct testimony of Chris Brown) at p. 23, line 6 – p. 24, line 19.

[71] AR, Vol. 22, Item 368 (excerpt from Report 362) at p. 79.

[72] This is an instance in which there is a slight difference in the District's 2009 and 2012 water conservation plans. The 2009 plan "encourages" customers to implement a voluntary time of day landscape watering "guideline." AR, Vol. 18, Item 236 (2009 WCP) at p. 10. The 2012 plan "urges" customers to implement a voluntary or mandatory time of day and day of week landscape watering "strategy." AR, Vol. 18, Item 239 (2012 WCP) at p. 12.

[73] AR, Vol. 22, Item 357 (direct testimony of Chris Brown) at p. 34, line 19 – p. 36, line 17.

TCEQ erroneously concluded that requirement had been met. The decision was not supported by substantial evidence, was arbitrary and capricious, an abuse of discretion, and contrary to law.[74]

The record does not include substantial evidence to support a finding that the District has actually implemented its conservation plan at the required level. Indeed, the record indicates that the only review of implementation was the one undertaken by NWF's water conservation expert, who indicated that the District had not implemented a water conservation plan that will result in the highest practicable levels of water conservation and efficiency achievable. After reviewing available information, he concluded that implementation reports prepared by the District fail to show implementation of, among other things, technical assistance programs, rebate programs, and landscape water conservation programs. He also indicated that expenditures by the District are inadequate to support programs at the levels needed to comply with Section 11.085 (l)(2) .[75]

The District's water conservation witness, Mr. Gooch, testified that, with respect to implementation, he only reviewed the content of the District's water conservation plan and did not review the District's implementation of its plan, other

---

[74] This issue was raised in NWF's Motion for Rehearing at pp. 3-4, 5-6, p. 7 (FOF 339, 342, 384), p. 10 (FOF 385, 435, 438-439), p. 11 (FOF 443), p. 12 (FOF 447), p. 13 (FOF 451) and pp. 13-15 (COL 27-29, COL 32-33).

[75] AR, Vol. 22, Item 357(direct testimony of Chris Brown) at p. 29, line 8 - p. 36, line 21.

than any implementation specifically indicated in the conservation plans themselves.[76] Both the 2009 and the 2012 plans are in evidence[77] and neither includes significant information about implementation that has occurred, much less information adequate to support a determination that the District's implementation will result in the highest practicable levels of water conservation and efficiency achievable.

Mr. Gooch also testified that he did not review the District's contracts with its customers or the water conservation plans of those customers.[78] Accordingly, he has no basis to support an opinion about the adequacy of implementation to satisfy Section 11.085 (l)(2), and his broad statements to the effect that the District complied with the statute do not constitute probative evidence that the District has implemented a water conservation in compliance with that requirement. *See, e.g., Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010) ("'[i]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is an objection'"). TCEQ argues[79] that, by failing to object during the hearing, NWF waived its arguments that the conclusory testimony of Mr. Gooch does not constitute

---

[76] AR, Vol. 24, Item 377 (hearing transcript for Jan. 18, 2013) at p. 895, line 3-line 17.

[77] AR, Vol. 18, Item 236 (2009 WCP) and Vol. 18, Item 239 (2012 WCP).

[78] AR, Vol. 24, Item 377 (hearing transcript for Jan. 18, 2013) at p. 895, line 3-line 17.

[79] TCEQ Brief at p. 17.

probative evidence. However, regardless of whether it was objected to, conclusory testimony does not constitute evidence of any probative value. *City of San Antonio v Pollock,* 284 S.W.3d 809, 816 (Tex. 2009)("this Court has held that such conclusory statements [made by experts] cannot support a judgment even when no objection was made to the statements at trial") (citing *Dallas Ry. & Terminal Co. v. Gossett,* 294 S.W.2d 377, 380 (Tex. 1956)("It is well settled that the naked and unsupported opinion or conclusion of a witness does not constitute evidence of probative force and will not support a jury finding even when admitted without objection.")); see also, *Rogers v. Texas Bd. Of Architectural Examiners,* 390 S.W.3d 377. 389-90 (Tex. App. – Austin 2011)("The Engineers' affidavits, even if unchallenged, are insufficient on their face to support judgment in the Engineers' favor because they are conclusory, i.e., they consist of conclusions unsupported by facts. It is well settled that the naked and unsupported opinion or conclusion of a witness, including an expert witness, does not constitute evidence of probative force and will not support a judgment even when admitted without objection.")

NWF is not seeking to strike that testimony. The relevant question is not whether NWF can object now that the testimony should have been excluded from the record. The testimony is in the record, but conclusory statements by Mr. Gooch that the District's plan complies with the requirements of Section 11.085 (1)(2) , do

46

not have probative value on the issue of the adequacy of implementation because he had no basis for that testimony.

TCEQ also argues[80] that NWF was required to specifically include its complaint about conclusory testimony in its Motion for Rehearing. However, as noted above, NWF is not seeking to correct an error regarding the admission of the evidence, but, instead, an error in reaching a decision that is not supported by the evidence. NWF specifically, and clearly, put TCEQ on notice in its Motion for Rehearing that it was challenging the sufficiency of evidence to support specifically identified findings of fact and conclusions of law related to the adequacy of implementation of the District's plan to satisfy Section 11.085 (l)(2). That was enough. *See Texas A.B.C. v. Top of the Strip*, 993 S.W.2d 242, 245-46 (Tex. App. – San Antonio 1999) (noting adequacy of motion for rehearing that referenced specific findings of fact as not being supported by substantial evidence and as arbitrary and capricious). NWF was not required to brief its legal arguments in its Motion for Rehearing. *See id.* at 245 (noting that a motion for rehearing need not comply with pleadings and practice of court trials).

Similarly, TCEQ's water conservation witness acknowledged his belief that no review of implementation had been done as part of the agency's processing of the

---

[80] TCEQ Brief at p. 18.

application.[81] That also is consistent with the conclusion in the TCEQ staff memorandum entitled "Technical Review of Water Conservation Plan" which states: "If UTRWD implements all elements of its water conservation plan, then staff believes that the highest practicable level of conservation for UTRWD can be achieved."[82] (Emphasis added). The staff memorandum notes the need—even to meet that impermissible reformulation of the statutory test which substitutes "can" for "will"—for the District to ensure implementation by its customers through its contracts.[83] No enforcement mechanism for ensuring that implementation is reflected in the memorandum or in the record. That TCEQ staff determination on implementation is not adequate to support a finding of compliance with the implementation requirement in Section 11.085 (l)(2). Nor does the testimony of the District's General Manager, Mr. Taylor, indicate compliance.[84] The plain language of the statute requires that the District must have developed and implemented a plan

---

[81] AR, Vol. 25, Item 380 (hearing transcript for Jan. 23, 2013) at p. 1660, line 4 – line 10; *see also id.* at p. 1651, line 12 – 23.

[82] AR, Vol. 22, Item 353 (TCEQ Memorandum, Technical Review of Water Conservation Plan) at p. 8.

[83] *Id.*

[84] As indicated by TCEQ in its Brief, at pages 20-21, the District's General Manager also testified. He did indicate that the District has certain water conservation measures it implements. NWF does not dispute that. However, he was not offered or qualified as an expert witness on water conservation and did not offer testimony about the adequacy of those measures or the District's implementation to comply with Section 11.085 (l)(2) or any other regulatory requirement. The District's brief includes statements about implementation that NWF's counsel was not able to verify in the record. See District brief at p. 8 at FN 31 and FN 37 and accompanying test, p. 25 at FN 69 and accompanying text, and p. 28 at FN 84 and accompanying text.

48

that will result in the highest practicable levels of water conservation and efficiency achievable within its jurisdiction as a prerequisite to approval of the application. Without a demonstration of adequate implementation, there is no basis for determining the District's water conservation plan, even if it were otherwise an adequate plan, will result in anything more than a document taking up space on a shelf.

There is not substantial evidence to support a finding that the District has implemented its water conservation plan in a way that will result in the highest practicable levels of water conservation and efficiency achievable. Mr. Brown, the only expert to review actual implementation, testified that the District has not undertaken the required implementation.

## D. TCEQ erred in determining that the District's water conservation plan includes the means for implementation and enforcement required by TCEQ's rules.

The record does not support TCEQ's determination that the District's water conservation plan meets the requirements of agency rules related to demonstration of a means for enforcement.[85] That determination is not supported by substantial evidence and is arbitrary and capricious.

TCEQ's rules require that a water conservation plan for a wholesale water supplier, regardless of whether an interbasin transfer is requested, must include "a

---

[85] This issue was raised in NWF's Motion for Rehearing at p.2, p. 3, p. 7, p. 9 (FOF 335), and pp. 13-14 (COL 20, 27-29, and 32-33).

means for implementation and enforcement, which shall be evidenced by a copy of the ordinance, rule, resolution, or tariff, indicating official adoption of the water conservation plan by the water supplier; and a description of the authority by which the water supplier will implement and enforce the conservation plan."[86] Compliance with that requirement is a specific prerequisite to issuance of a permit.[87] The District's plan does include a resolution reflecting the adoption of the plan[88] and notes that the District's contracts with its customers reference water conservation and include language to the effect that customers agree to cooperate in implementing water conservation.[89] That language does appear to address a potential mechanism for implementation of the plan, although only in a cursory fashion. However, nothing in the plan provides the required discussion of enforcement or describes the authority by which the plan will be enforced if that cooperation is not forthcoming. TCEQ argues that the plan's language calling for customer's to adopt and enforce water

---

[86] 30 TAC § 288.5 (1)(H).

[87] 30 TAC Section 295.9 provides that an application which doesn't meet the requirements for water conservation plans set out in that section is incomplete and shall not be considered by the commission. Paragraph (2) provides that applications for wholesale water providers, like the District, must include a water conservation plan meeting the requirements of 30 TAC Chapter 288 of TCEQ's rules. 30 TAC Section 297.18 (d)(2) also expressly requires applicants for interbasin transfers to comply with the provisions of Chapter 288.

[88] AR, Vol. 18, Item 236 (2009 Water Conservation Plan) at Appendix D and Item 239 (2012 Water Conservation Plan) at Appendix D. Although those resolutions note that the Executive Director is directed to implement and enforce the respective plans, there is no description of the enforcement mechanism or authority.

[89] AR, Vol. 18, Item 236 (2009 Water Conservation Plan) at Sections 4.4 and 7 and Item 239 (2012 Water Conservation Plan) at Sections 4.4, 5.7, and 6.

conservation plans satisfies the requirement.[90] However, that is a circular argument. It is the District's obligation to ensure enforcement. The District has not shown that it has a mechanism for ensuring that its customers adopt adequate plans and enforce them. The plan has no information on how the District will enforce a requirement that its customers develop and enforce adequate plans.

The shortcoming is not merely a technical failure to describe in the plan an actual enforcement mechanism that exists. Neither the District's General Manager, Mr. Taylor,[91] nor its water conservation witness, Mr. Gooch,[92] were able to identify or describe any mechanism to enforce implementation of the water conservation plan other than the District "working with" its customers. BMP 2.14 in Report 362 includes a recommendation that wholesale water providers like the District consider developing and adopting penalties for customers that don't comply.[93] Mr. Gooch indicated that he did not see any language addressing penalties for noncompliance in the District's water conservation plan and that he was unaware if the District has such penalties.[94] He also testified that he did not know the nature of the District's

---

[90] TCEQ Brief at p. 27.

[91] AR Vol. 24, Item 374 (hearing transcript for Jan. 15, 2013) at p. 61, line 9 – p. 63, line 16.

[92] AR, Vol. 24, Item 377 (hearing transcript for Jan. 18, 2013) at p. 844, line 11 – p. 845, line 22; p. 848, line 10 – line 25; p. 923, line 23 – p. 926, line 8.

[93] AR, Vol. 22, Item 368 (excerpt from Report 362) at p. 79, Item 4. Report 362 does not define what types of penalties are recommended and various types of negative incentives, such as contractual provisions providing for surcharges for failure to comply, could, arguably, serve the purpose. However, the District's plan has no such mechanisms.

[94] AR, Vol. 24, Item 377 (hearing transcript for Jan. 18, 2013) at p. 924, line 1 – p. 925 line 2.

authority to enforce the plan.[95] Mr. Gooch was not familiar with the District's contracts with its customers or even if the District actually reviews the water conservation plans of its customers.[96] Mr. Brown, NWF's water conservation expert, did review enforcement and testified that he was not able to determine that the District does any enforcement of its water conservation program and that his review did not indicate effective implementation by its customers.[97] TCEQ's water conservation witness testified that he doesn't know what happens if a customer of the District fails to implement the water conservation plan.[98]

The record does include conclusory opinions from Mr. Gooch averring compliance with the requirements of Section 288.5. However, because, as discussed above, Mr. Gooch was unable to provide any basis for testifying about compliance as it relates to enforcement of the conservation plan, those opinions do not constitute probative evidence on that point, regardless of whether the testimony was objected to. *See Jelinek*, 328 S.W.2d at 536 ("'[i]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is an objection'")(citing *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009),

---

[95] AR, Vol. 24, Item 377 at p. 898, line 23 – line 25.

[96] *Id.* at p. 876, lines 6 – 20.

[97] AR, Vol. 22, Item 357 (direct testimony of Chris Brown) at p. 31, line 16 – p. 33, line 16.

[98] AR Vol. 25, Item 380 (hearing transcript for Jan. 23, 2013) at p. 1662, line 18 – line 21.

other citations omitted), *See also Duncan-Hubert v. Mitchell*, 310 S.W.3d 92, 101 (Tex.App. – Dallas 2010)("Bare, baseless opinions will not support a judgment even if there is no objection to their admission in evidence," citations omitted). TCEQ argues that, by failing to object during the hearing, NWF waived its arguments that the conclusory testimony of Mr. Gooch does not constitute relevant evidence.[99] However, regardless of whether it was objected to, conclusory testimony does not constitute evidence of any probative value. Contrary to the arguments of TCEQ and the District, the relevant question is not whether NWF can object now that the testimony should have been excluded from the record. The testimony is in the record, but it has no probative value in supporting the decision.

TCEQ also argues[100] that NWF was required to specifically include its complaint about conclusory testimony in its Motion for Rehearing. However, as noted above, NWF is not seeking to correct an error regarding the admission of the evidence, but, instead, an error in reaching a decision that is not supported by the evidence. NWF specifically, and clearly, put TCEQ on notice in its Motion for Rehearing that it was challenging the sufficiency of evidence to support specifically identified findings of fact and conclusions of law related to demonstration of compliance with Section 288.5 (1)(H) of the agency's rules. That was enough. *See*

---

[99] TCEQ Brief at p. 17.
[100] Id.

*Texas A.B.C. v. Top of the Strip*, 993 S.W.2d 242, 245-46 (Tex. App. – San Antonio 1999) (noting adequacy of motion for rehearing that referenced specific findings of fact as not being supported by substantial evidence and as arbitrary and capricious). NWF was not required to brief its legal arguments in its Motion for Rehearing. *See Id.* at 245 (noting that a motion for rehearing need not comply with pleadings and practice of court trials).

The District argues[101] that, in order to raise issues about compliance with Section 288.5 (1)(H) , NWF was required to challenge the 2004 determination by the Executive Director of TCEQ that the District's application was administratively complete and the agency findings related to that earlier determination. NWF put TCEQ on notice in the Motion for Rehearing and in the Original Petition that NWF was challenging compliance with Section 288.5 (1)(H) . That was sufficient.[102] NWF could also have challenged findings about the administrative completeness determination made by the Executive Director in 2004 but it would have been pointless and there is no requirement to have done so.

---

[101] District's Brief at pp 31-34.

[102] The District cites *Hamamcy v. Texas State Bd. of Medical Examiners* in support of its argument but that case dealt with a Motion for Rehearing which "stated, in its entirety, that `[t]he presentation of the discussion at the hearing will be done from the charts of the patients and from the records on file with the Board.'" 900 S.W.2d 423, 425 (Tex. App.—Austin 1995, writ denied). That stands in sharp contrast to the Motion for Rehearing in this case which cited specific findings and conclusions and clearly stated the contention of a lack of substantial evidence to support the determination of compliance with Section 288.5 (1)(H).

The District's argument also is inconsistent with TCEQ's review of the application and with the testimony of its witnesses. TCEQ staff only performed its technical review[103] of the adequacy of the District's water conservation plan in 2011 and included the District's 2009 water conservation plan, the most current available at the time, in the review for purposes of evaluating compliance with the requirements of various agency rules, including Chapter 288, and of various provisions of the Water Code, including Section 11.085.[104] The District's water conservation witness relied on the 2009 Plan and the 2012 Plan in asserting compliance with the requirements of Chapter 288.[105] NWF also referenced in its Original Petition,[106] Section 297.18 (d)(2) of TCEQ's rules as an independent basis for requiring compliance with Chapter 288 requirements for an application involving an interbasin transfer of water.

Moreover, there is nothing in the language of the second sentence of Section 295.9 that purports to limit the requirements in that Section solely to the determination of administrative completeness. Administrative completeness, which

---

[103] The difference between an administrative review and a technical review is that an administrative review is a check-off level review of whether various components are included and the determination of adequacy is part of the technical review, which is also called the substantive review. AR, Vol. 25, Item 380 at p. 1640, line 14 through p. 1641, line 11.

[104] AR, Vol. 22, Item 353, at pp. 1-2.

[105] AR, Vol. 18, Item 218 (direct testimony of Tom Gooch), at p. 67, line 19 – p. 69, line 18. The 2012 plan is discussed beginning at p. 85 of that exhibit. Rule references in Mr. Gooch's testimony are incorrect because of a rule change made before the hearing. Thus, for example, what Mr. Gooch refers to as Section 288.5 (1)(I) is actually 288.5 (1)(H).

[106] Original Petition at p. 9 (Error No. 3).

is determined by the Executive Director of TCEQ, is only one step of the review process and TCEQ's rules[107] require that water conservation plans supporting an application must be subject to review and approval by the agency's commission, which, in the case of a contested application, only occurs when the proposal for decision is presented to the commission for its consideration.

Similarly, as noted above, TCEQ's witness was unable to provide any basis for a determination of adequate enforcement authority. The agency's technical review memorandum on water conservation is devoid of any discussion about enforcement authority or compliance with Section 288.5 (1)(H) .[108]

More specifically, the relevant water conservation plan is in the record and there is no description in that plan of authority by which the District will enforce it. In light of that, no testimony could provide an adequate basis in the record for a reasonable mind to conclude that the conservation plan does include the required means of enforcement or description of enforcement authority. *See City of El Paso v. Public Utility Commission*, 839 S.W.2d 895, 905-06 (Tex.App. – Austin 1992) ("In conducting a substantial evidence review, we must determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action."). Testimony that

[107] 30 TAC §288.30 (8)
[108] AR, Vol. 22, Item 353.

the plan has a description of enforcement authority or that it complies with that requirement when the plan itself is in the record and lacks that discussion does not provide an adequate basis to allow a reasonable mind to conclude that the requirement is met. Furthermore, the District's witnesses testified that the only enforcement mechanism the District currently employs for customers who do not comply is to work with them.

There simply is not substantial evidence to support a finding of compliance with 30 TAC Section 288.5 (1)(H).

**E. TCEQ erred in determining that the District's water conservation plan includes the required basis for the development of its five-year and ten-year targets for water savings in accordance with TCEQ's rules.**

The record does not support a determination that the District's water conservation plan provides the required basis for the development of the mandated five-year and ten-year conservation targets.[109] The TCEQ determination that the plan complies with applicable requirements of the rules is not supported by substantial evidence and is arbitrary and capricious.

Pursuant to TCEQ's rules, a water conservation plan for a wholesale water supplier must include "specific, quantified five-year and ten-year targets for water savings including, where appropriate, target goals for municipal use in gallons per

---

[109] The failure of the District's water conservation plan to provide the required basis for its savings targets is addressed in NWF's Motion for Rehearing at p. 8 (FOF 332-334), p. 10 (FOF 435), pp. 13 (FOF 448) and pp. 13-14 (COL 20, 27-29, 32-33).

capita per day for the wholesaler's service area, maximum acceptable water loss, and the basis for the development of these goals." 30 TAC Section 288.5 (1)(B). Those rules apply regardless of whether an application for an interbasin transfer is involved. As evidenced by Mr. Gooch's testimony, the District's plans are lacking in any explanation of the basis for the development of the goals.[110] For example, the District has not explained why the starting points, in gallons per capita per day, for its 2009 and 2012 plans vary significantly, with the starting point for per capita use in the 2012 plan being shown as higher than the 2009 plan, hardly an endorsement of the effectiveness of its water conservation.[111] Mr. Gooch suggested that the variation probably is due to the difference in whether a wet year or a dry year was used as the starting point, but acknowledged that he didn't see the basis for the numbers in the plan.[112]

Regardless of the basis for the starting point, both the plan and the record are devoid of any explanation of the basis for the development of the goals.[113] TCEQ is

---

[110] AR, Vol. 24, Item 377 (hearing transcript for Jan. 18, 2013) at p. 920, line 6 – p. 923, line 22. In later testimony, as part of the Applicants' rebuttal case, Mr. Gooch noted that the starting point for average per capita use per day is described in the 2012 plan as being based on Region C Water Plan projections. However, he indicated that he did not know how it was actually calculated and further confirmed that he did not know how the indicated reduction in per capita use—the goal—was calculated. AR, Vol. 25, Item 380 (hearing transcript for Jan. 23, 2013) at p. 1845, line 7 – p. 1847, line 25.

[111] *Id.*

[112] AR, Vol. 24, Item 377 (hearing transcript for Jan. 18, 2013) at p. 921, line 7 – p. 923, line 9.

[113] TCEQ argues that NWF did not preserve this error in its Motion for Rehearing. TCEQ Brief at p. 24. However, NWF's Motion for Rehearing, with respect to FOFs 332 and 334, sufficiently put TCEQ on notice of its contention that the basis for determining the District's goals were reasonable was missing from the record.

required to follow its rules. *Flores v. Employees Retirement System of Texas*, 74 S.W.3d 532, 542 (Tex.App.—Austin 2002, pet. denied).

That is not just a minor detail. Other than a specific goal for percentage of unaccounted for water, the measures in the District's water conservation plan are not quantified except through the per capita target goals. For example, there is no quantification of how much public education will be provided.[114] Indeed, TCEQ's water conservation witness testified that, for example for a public education campaign, the agency does not "have a mechanism in place to evaluate their program as adequate or not, you know, from their water conservation plan."[115] That quantification, and an explanation of its basis, is a specific requirement for any water conservation plan, especially for one that purports to be adequate to result in the highest practicable levels of water conservation and efficiency achievable. Compliance with the rules is also a specific prerequisite to issuance of a permit.[116] Even if the measures included in the District's plan did include the full universe of measures that might be needed to reach the highest practicable levels of water

[114] AR, Vol. 18, Item 239 (2012 WCP) at pp. 10-11.
[115] AR, Vol. 24, Item 380 (hearing transcript for January 23, 2013) at p. 1649, line 5 – p. 1651, line 17.
[116] 30 TAC Section 295.9 provides that an application which doesn't meet the requirements for water conservation plans set out in that section is incomplete and shall not be considered by the commission. Paragraph (2) provides that applications for wholesale water providers, like the District, must include a water conservation plan meeting the requirements of 30 TAC Chapter 288 of TCEQ's rules. In addition, 30 TAC Section 297.18 (d)(2) also imposes that requirement for applications involving interbasin transfers.

59

conservation and efficiency achievable, establishing a sufficient amount or level of effort associated with those measures is essential for a reasoned determination of whether the statutory standard has been met. The record is devoid of any basis for determining that the level of effort called for in the District's water conservation plan is sufficient to meet the statutory test.

Other than conclusory statements about compliance with Section 288.5, which do not constitute probative evidence because they lack a reasoned basis, there is not evidence to support those targets. Because Mr. Gooch was unable to provide any basis for that opinion as it relates to the inclusion of the required basis for the development of the five-year and the ten-year targets, it does not constitute probative evidence on that point. *See Jelinek,* 328 S.W.2d at 536.

## F. TCEQ's errors prejudiced NWF's substantial rights within the meaning of Section 2001.174 (2) of the Government Code

The District argues that NWF has failed to demonstrate prejudice to its substantial rights in accordance with Section 2001.174 (2) of the Texas Government Code. Basically, the District appears to contend that NWF does not have a substantial right to a decision made in accordance with governing statutes and rules.[117] There is limited precedent, but the cases addressing the issue, like the ones

---

[117] Although not construing Section 2001.174, in *Texas Water Development Board v. Ward Timber,* 411 S.W.2d 554, 568 (Tex.App.—Eastland, 2013) the court recognized the right of the parties appealing the agency decision "to have the Board follow the statute and its own rule ...."

60

cited by the District, indicate that the relevant test is one of determining if the error complained of actually detrimentally affected the appealing party. For example, in *R.R. Comm'n v. Rio Grande Valley Gas Co.*, 683 S.W.2d 783, 789 (Tex. App. Austin 1984), the court determined that the exclusion of evidence, even assuming the exhibits should have been admitted, did not prejudice the appellee because the evidence did not address the specific issue in dispute. What emerges from a review of cases addressing this issue is a results-based approach, which looks at the extent to which the alleged error likely affected the outcome of the agency decision to the detriment of the appealing party. That is also consistent with Rule of Appellate Procedure 44.1 (a),[118] establishing the standard for reversible error. If the error complained of is likely to have affected the agency decision adversely to the complaining party, then the test is satisfied.

The cases cited by the District illustrate that approach. In *United Sav. Ass'n of Tex. v. Vandygriff*, 594 S.W.2d 163 (Tex. Civ. App.—Austin 1980), the court notes that the appealing party, who participated in the hearing to oppose the name change of a competitor savings and loan, had not shown harm in claiming it was error for the decision to delay for a year the effective date of the name change the

---

[118] TRAP 44.1, Reversible Error in Civil Cases, (a) Standard for Reversible Error. No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of:
(1) probably caused the rendition of an improper judgment; or
(2) probably prevented the appellant from properly presenting the case to the court of appeals.

61

appealing party opposed. The court, in interpreting the question of prejudice of substantial rights, determined that because, if anything, the appealing party benefited[119] from the delay, "[e]ven if the Commissioner exceeded his statutory authority, we find no substantial rights of United Savings prejudiced by the Commissioner's delay of the effective date of the order." *Id.* at 172.

In *Lone Star R.V. Sales v. Motor Vehicle Bd. of Tex. Dep't of Transp.*, 49 S.W.3d 492, 500 (Tex. App.—Austin 2001, no pet.), the court determined that the appealing party was not prejudiced by the failure of the agency to grant it a continuance when it had not actually asked for a continuance and had been provided ample opportunity to make its arguments.[120] Those two cases stand for the unremarkable proposition that errors which benefited the appealing party or did not actually affect the outcome or otherwise cause harm to the appealing party's presentation of its case do not demonstrate prejudice to substantial rights. The other case cited by the District, *Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984), merely quotes the language of Section 2001.174 (2) without interpreting or applying it.

---

[119] "If anything, United Savings should benefit from postponement, which allows a longer period in which to disassociate itself in the public mind from the name `Southwestern Savings.'" *United Sav. Ass'n of Tex.*, 594 S.W.2d at 172.

[120] "Lone Star does not point to a single argument that it was not permitted to fully make either in its own exceptions or in argument to the Board. Finding that the purpose of the rules—to ensure a fair, just, and effective adjudication of the parties' rights—was served, and that no prejudice to Lone Star's substantial rights occurred, we overrule its first three issues." *Lone Star R.V. Sales*, 49 S.W.3d at 500.

NWF, like any party to a contested case hearing, has the right to have a decision rendered in compliance with applicable law. If, as the District Court found, TCEQ failed to comply with Section 11.085 (l)(2) in making its decision, NWF's substantial rights were prejudiced by that failure and the agency's decision must be reversed. That also is true if, as NWF contends, the decision is not supported by substantial evidence. This is not a situation where NWF is complaining about a procedural or evidentiary ruling and a serious question exists about whether the ruling actually affected the outcome or prejudiced NWF's rights. As an affected person and party to the hearing, NWF was entitled to a decision made in compliance with applicable rules and statutes and TCEQ's failure to follow controlling law resulted in substantial harm to NWF. Each error complained of by NWF affected the agency decision adversely to NWF in a substantial way.

## PRAYER

TCEQ's decision in this matter to grant the District's application is not supported by substantial evidence, is arbitrary and capricious, an abuse of discretion, and contrary to law. Accordingly, NWF respectfully requests that this Court affirm the decision of the District Court or, if the District Court decision is not affirmed, reverse the decision of TCEQ based on its failure to comply with the requirements of 30 TAC Sections 288.5 (1)(B) and (1)(H).[121]

Respectfully Submitted,

/s/ Myron J. Hess

Myron J. Hess
State Bar No. 09549415
Annie E. Kellough
State Bar No. 24074517

NATIONAL WILDLIFE FEDERATION
44 East Ave., Ste. 200
Austin, Texas 78701
Telephone: (512) 610 – 7754
Facsimile: (512) 476 – 9810
hess@nwf.org
kellougha@nwf.org

COUNSEL FOR APPELLEE NATIONAL
WILDLIFE FEDERATION

---

[121] The District Court did not reach those issues because it reversed the agency decision for a failure to comply with the requirements of Section 11.085 (1)(2) of the Water Code.

## CERTIFICATE OF COMPLIANCE

I certify that this Brief of the Appellee, National Wildlife Federation, complies with the word-count limitations of Tex. R. App. P. 9.4(i)(2)(B), because it contains 12,835 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

/s/ Myron J. Hess
MYRON J. HESS

## CERTIFICATE OF SERVICE

By my signature below, I certify that on this 27th day of July 2015, a true and correct copy of the foregoing *Brief of Appellee* was served upon the parties identified below by electronic service.

/s/ Myron J. Hess

Myron J. Hess

Lambeth Townsend
Jason Hill
Elizabeth P. Hernandez
Lloyd, Gosselink, Rochelle & Townsend
816 Congress Ave., Ste. 1900
Austin, Texas 78701
ltownsend@lglawfirm.com
jhill@lglawfirm.com
ehernandez@lglawfirm.com
**Attorneys for Upper Trinity Regional Water District**

Cynthia Woelk
Office of the Attorney General
Environmental Protection Division (MC-066)
P.O. Box 12548
Austin, Texas 78711-2548
Cynthia.Woelk@texasattorneygeneral.gov
**Attorney for Texas Commission on Environmental Quality**

# TABLE OF APPENDICES

Appendix 1:    Technical Review of Water Conservation Plan, Texas Commission on Environmental Quality, February 15, 2011.

Appendix 2:    Unofficial transcript of portion of Agenda Item 1, Texas Commission on Environmental Quality Commissioners Meeting – September 24, 2013; full recording is available at AR, Vol. 26, Item 383.

Appendix 3:    S.B. 1094, 2003 Leg., 78(R) Sess. (Tx. 2003).

Appendix 4:    H.B. 2660, 2003 Leg., 78(R) Sess. (Tx. 2003).

Appendix 5:    Statutes

        Tex. Gov't Code Section 2001.172

        Tex. Water Code Section 16.053 (a)

Appendix 6:    30 Tex. Admin Code Section 295.9

# Appendix 1

# Texas Commission on Environmental Quality

**To:**       Ronald Ellis, Project Manager        **Date:** February 15, 2011
               Water Rights Permitting Team
               Water Supply Division

**Thru:**      Christopher Loft, Team Leader
               Resource Protection Team
               Water Supply Division

               Scott Swanson, Senior Water Conservation Specialist
               Resource Protection Team
               Water Supply Division

**From:**     Kristin Wang, Senior Water Conservation Specialist
               Resource Protection Team
               Water Supply Division

**Subject:**   Upper Trinity Regional Water District (UTRWD)
               WRPERM5821
               CN600639272
               Technical Review of Water Conservation Plan

Upper Trinity Regional Water District (UTRWD or applicant) seeks authorization to construct and maintain a dam and reservoir (known as Lake Ralph Hall) with a maximum capacity of 180,000 acre-feet of water and a surface area of 8,500 acres on the North Sulphur River, Sulphur River Basin, Fannin County, Texas for in-place recreation purposes and to divert and use not to exceed 45,000 acre-feet of water per year from Lake Ralph Hall at a maximum diversion rate of 205 cfs (92,000 gpm) for municipal, industrial, and agricultural purposes. The application also requests authorization to overdraft the reservoir as part of a system operation with existing UTRWD supplies. Applicant requests to use the water in Collin, Cooke, Dallas, Denton, Fannin, Grayson, and Wise Counties within the Sulphur River and Trinity River Basins and requests an interbasin transfer (IBT) of water from the Sulphur River Basin to the Trinity River Basin.

The applicant is required to provide evidence that the amount of water appropriated will be beneficially used, i.e., effectively managed and not wasted pursuant to Texas Water Code (TWC), Section 11.134(b)(3)(A). Also, the applicant must provide evidence that reasonable diligence will be used to avoid waste and achieve water conservation pursuant to TWC 11.134(b)(4). To provide that evidence, the applicant must submit a water conservation plan in accordance with Title 30, Texas Administrative Code (TAC), Chapter 288. In applications where a new appropriation of water is requested, the technical review includes an analysis of whether the requested appropriation is reasonable and necessary for the proposed uses in accordance with TWC 11.134 and 30 TAC 297.50. In applications where an IBT is requested, the technical

1

Brown Exh. 5

review considers water conservation efforts in accordance with the requirements of 30 TAC 297.18 and TWC 11.085.

The purpose of this technical review is to:

(1) determine whether reasonable water conservation goals have been set;
(2) determine whether the proposed strategies can achieve the stated goals;
(3) determine whether there is a substantiated need for the water and whether the amount to be appropriated is reasonable for the proposed use;
(4) determine whether the application meets the requirements of TWC 11.085(k) and (l) for IBTs; and
(5) determine whether the water conservation plan addresses a water supply need in a manner that is consistent with the state water plan and the relevant approved regional water plan.

If these criteria are met, then staff considers this sufficient evidence to conclude that the applicant will avoid waste and achieve water conservation. This technical review forms a basis for permit conditions and limitations as provided by TWC 11.134 and 11.085.

UTRWD's water right application was received on September 2, 2003. UTRWD submitted a 2002 water conservation plan, additional information in 2004, and an amended plan in 2005. In 2009, UTRWD submitted an updated water conservation and drought contingency plan.

WATER CONSERVATION GOALS & STRATEGIES
UTRWD's plans were first reviewed in accordance with 30 TAC 288. As a wholesale water supplier, UTRWD does control the operation of its water supply, treatment, and transmission system and can take direct action to maximumize the efficiency of the system. UTRWD's average unaccounted for water has been approximately three percent (3%) and UTRWD measures all raw water diversions using meters with an accuracy of plus or minus two percent (2%).

The following goals and strategies have been outlined by UTRWD for water conservation and include:

1. Five-year and 10-year conservation goals of 175 gallons per capita per day (gpcd).
2. Maintain unaccounted-for water in the system below ten percent (10%) annually.
3. Meter and record water deliveries and sales with a minimum accuracy of plus or minus two percent (2%).
4. Maintain programs for leak detection and repair, and water loss accounting.
5. Raise public awareness of water conservation and encourage responsible public behavior (Public Education Program).
6. Reuse and recycling of reclaimed wastewater.

Staff determined that the overall water conservation strategies provided in the UTRWD's water conservation plan are reasonable and can achieve the stated goals.

2

## WATER NEED

Based on the 2009 water conservation plan, UTRWD currently provides wholesale treated water service to nineteen members and customers (serving more than twenty-five communities) in Denton and Collin Counties. UTRWD's planning area includes the communities currently served plus additional portions of Grayson, Wise, and Cook Counties.

UTRWD purchases raw water from the City of Dallas and City of Denton out of Lewisville Lake and Ray Roberts Lake. Further, UTRWD has a contract for raw water from Lake Chapman in the Sulphur River Basin and a permit to reuse water transferred from Lake Chapman to the Trinity River Basin.

According to the 2006 Region C Water Plan, UTRWD currently supplies treated water to users in Denton County, and a small amount to users in Collin County. UTRWD also provides direct reuse for irrigation in Denton County. The total existing supplies can provide between 25,200 and 42,200 acre-feet per year from 2010 to 2060.

Considering losses associated with treatment and distribution, UTRWD needs to develop an additional 7,000 acre-feet per year of raw water supplies by 2010 to meet projected demands and an additional 122,000 acre-feet per year by 2060. UTRWD will also need to develop additional treatment and distribution capacity to serve the growing demands of its current and future customers.

The recommended water management strategies listed in Region C Water Plan for UTRWD include the following:

- Conservation
- Additional supplies from Dallas Water Utilities (DWU) under current contract
- Lake Chapman indirect reuse
- Additional supplies from DWU linked to Lake Chapman reuse
- Lake Ralph Hall
- Indirect reuse of return flows from Lake Ralph Hall
- Marvin Nichols Reservoir
- Additional DWU supplies
- Oklahoma water
- Water treatment plant and distribution system improvements

| Table 1<br>Recommended Water Management Strategies for<br>Upper Trinity Regional Water District<br>(acre-feet per year) | | | | | | |
|---|---|---|---|---|---|---|
| Source | 2010 | 2020 | 2030 | 2040 | 2050 | 2060 |
| **Current Supplies** | | | | | | |
| Lake Chapman | 14,068 | 13,835 | 13,602 | 13,369 | 13,136 | 12,905 |
| DWU | 10,317 | 11,041 | 14,458 | 19,867 | 28,184 | 27,463 |
| Direct Reuse | 897 | 897 | 897 | 897 | 897 | 897 |
| **Total Existing** | **25,282** | **25,773** | **28,957** | **34,133** | **42,217** | **41,265** |
| **Water Management Strategies** | | | | | | |
| Conservation | 850 | 3,070 | 4,933 | 7,196 | 9,643 | 11,762 |
| Additional Supplies from DWU (Under Current Contract) | 1,000 | 1,000 | 1,000 | 1,000 | 23,295 | 27,386 |
| Lake Chapman Indirect Reuse | 8,441 | 8,301 | 8,161 | 8,021 | 7,882 | 7,743 |
| Additional DWU Supplies (Reuse) | 5,627 | 5,534 | 5,441 | 5,348 | 5,254 | 5,162 |
| Lake Ralph Hall | | 29,600 | 29,600 | 29,600 | 29,600 | 29,600 |
| Additional Indirect Reuse | | 17,760 | 17,760 | 17,760 | 17,760 | 17,760 |
| Marvin Nichols Reservoir | | | 17,500 | 35,000 | 35,000 | 35,000 |
| Additional DWU Supplies | | | | | 2,200 | 6,000 |
| Oklahoma Water | | | | | | 15,000 |
| **Total Supplies of Strategies** | **15,918** | **65,265** | **84,395** | **103,925** | **130,634** | **155,413** |
| **Total Supplies** | **41,200** | **91,039** | **113,351** | **138,058** | **172,851** | **196,678** |
| Portion of DWU Supply from Reuse | 5,627 | 5,534 | 5,441 | 5,348 | 12,690 | 15,266 |
| Total from Conservation & Reuse | 15,815 | 35,562 | 37,192 | 39,222 | 48,872 | 53,428 |
| Percent from Conservation & Reuse | 38.4% | 39.1% | 32.8% | 28.4% | 28.3% | 27.2% |
| **Project Demands** | **31,769** | **56,353** | **80,904** | **109,456** | **136,932** | **155,831** |
| Losses in Treatment and Transmission | 1,588 | 2,818 | 4,045 | 5,473 | 6,847 | 7,792 |
| Surplus | 7,843 | 31,868 | 28,402 | 23,128 | 29,072 | 33,055 |

*source: 2006 Region C Water Plan (Volume I, Table 4E.14, pages 4E.40-4E.41)*

Table 1 shows the recommended water management strategies for UTRWD's water supply development. Conservation savings from UTRWD's existing and potential customers is projected to reach 11,762 acre-feet per year by 2060. As shown in Table 1 above, 29,600 acre-feet per year of the yield from Lake Ralph Hall (32,940 acre-feet) has been listed as a recommended supply strategy to help UTRWD meet projected water demands for the next 50-year planning period.

ALTERNATIVE WATER MANAGEMENT STRATEGIES

The 2006 Region C Water Plan also indicates that if any of the projects identified in the recommended plan are not implemented, UTRWD may wish to pursue alternative strategies. The following alternative water management strategies are recommended for UTRWD:

- Toledo Bend Reservoir
- Wright Patman Lake
- George Parkhouse Reservoir (North)
- George Parkhouse Reservoir (South)
- Lake Texoma
- Additional reuse

INTERBASIN TRANSFER CONSIDERATIONS

Review of the IBT request is based on the projected water needs for the basin of origin and receiving basin for the 50-year planning period. The Sulphur River Basin is the basin of origin and the Trinity River Basin is the receiving basin for the proposed Lake Ralph Hall Project. A comparison of the total available supplies to projected demands for the Sulphur and Trinity River Basins is shown in Table 2, which is based on the information provided in the 2006 Region C Water Plan. From the table, the Sulphur River Basin shows a surplus of water, while the Trinity River Basin is projected to have shortages during the 50-year planning period.

| Table 2 Difference in Total Available Water Supply and Total Water Demand by Basin Shown as Surplus or (Shortage) ( acre-feet per year) | | | | | | |
|---|---|---|---|---|---|---|
| River Basin | 2010 | 2020 | 2030 | 2040 | 2050 | 2060 |
| Sulphur | 222,104 | 209,476 | 198,260 | 187,562 | 177,332 | 161,760 |
| Trinity | 1,065,986 | 722,172 | 451,588 | 177,387 | (145,550) | (535,830) |

*source: 2006 Region C Water Plan (Volume I, Table 4C.5, page 4C.19)

Projected shortages in the Trinity River Basin will reach 145,550 and 535,830 acre-feet per year in 2050 and 2060, respectively. The plan indicates that the IBT request from this project can help meet the water demands for Trinity River Basin during the 50-year planning period and meet the overall water demands for the region.

5

The economic impacts of new reservoirs (including Lake Ralph Hall) were discussed and considered in the 2006 Region C Water Plan (*Volume 1*). The plan indicates that new reservoirs can stimulate the rural economy through new recreational business and local improvement. The 2006 Region C Water Plan also includes a preliminary analysis of the impacts of not meeting the projected water demands. The analysis indicates that a severe drought occurring in a single year would reduce the projected 2060 population, employment, and income trends. Further, the plan indicates if no additional water supplies are developed, Region C will face substantial shortages in water supply over the next several decades. This information is presented in Appendix Q of the Region C Water Plan. For municipal uses, the economic impacts by counties (for example Fannin and Denton), and distribution of regional impact among major river basins (Sulphur and Trinity) were considered.

Based on the 2006 Region C Water Plan, UTRWD plans to provide 10% of the yield from Lake Ralph Hall for use in southern Fannin County. The City of Ladonia uses the Trinity Aquifer as their current water supply. According to the 2006 Region C Water Plan, Ladonia will have water shortages throughout the 50-year planning period. The recommended water management strategies to meet their needs include water conservation, overdraft of the Trinity Aquifer with new wells, and purchase of water from UTRWD (Lake Ralph Hall). The City of Ladonia's projected population, total projected water demand, current supply, and water management strategies are summarized in Table 3.

| Table 3 Water Planning Summary for City of Ladonia (acre-feet per year) | | | | | | |
|---|---|---|---|---|---|---|
| | 2010 | 2020 | 2030 | 2040 | 2050 | 2060 |
| Projected Population | 1,500 | 1,600 | 2,000 | 2,200 | 2,500 | 3,000 |
| Projected Municipal Water Demand | 546 | 577 | 715 | 779 | 879 | 1,055 |
| Current Available Water Supplies (Trinity Aquifer) | 276 | 276 | 276 | 276 | 276 | 276 |
| Water Management Strategies | | | | | | |
| Water Conservation – Basic Strategies | 16 | 27 | 40 | 50 | 64 | 85 |
| Water Conservation – Expanded Strategies | 0 | 2 | 5 | 6 | 6 | 8 |
| Ralph Hall Reservoir | 0 | 558 | 709 | 754 | 914 | 1,140 |
| Overdraft Trinity Aquifer (New Wells) | 254 | 0 | 0 | 0 | 0 | 0 |
| Total Water Management Strategies | 270 | 587 | 754 | 810 | 984 | 1,233 |
| | | | | | | |
| Total Supply Less Projected Demand | 0 | 286 | 315 | 307 | 381 | 454 |

*source: 2006 Region C Water Plan (Volume IV, Appendix V, Table V-1, page 64 of 112)

With the Trinity Aquifer as the only current water supply, Ladonia will have a maximum need of 779 acre-feet per year during the 50-year planning period. The City's water needs can be

supplemented by the Lake Ralph Hall project, which can provide Ladonia with 558 to 1,140 acre-feet of water per year from 2020 to 2060. Therefore, the Lake Ralph Hall project will benefit the Sulphur River Basin by providing additional water supply to City of Ladonia.

As previously shown in Table 2, the Trinity River Basin will have water shortages during the 50-year planning period. Many water user groups in Denton County receive water supplies from UTRWD. Table 4 summarizes population projections, water demand projections, currently available supplies, and water needs for Denton County. Denton County will have projected water needs of 24,753, 113,311, and 256,411 acre-feet per year in 2010, 2030, and 2060, respectively.

| Table 4 Population and Water Planning Summary for Denton County (water quantities in acre-feet per year) | | | | | | |
|---|---|---|---|---|---|---|
| | **2010** | **2020** | **2030** | **2040** | **2050** | **2060** |
| Population Projections | 720,064 | 953,668 | 1,184,744 | 1,392,575 | 1,610,447 | 1,870,472 |
| Water Demand Projections | 162,003 | 212,211 | 263,594 | 307,951 | 353,800 | 406,700 |
| Currently Available Supplies | 137,250 | 142,695 | 150,283 | 153,531 | 155,652 | 150,289 |
| Water Need | 24,753 | 69,516 | 113,311 | 154,420 | 198,148 | 256,411 |

*source: 2006 Region C Water Plan (Volume I, Tables 2.1, 2.2, 3.7 & 4A.2, pages 2.8, 2.19, 3.13& 4A.5)

UTRWD is a significant water supplier in this area in conjunction with other region water providers such as Dallas Water Utilities, City of Denton, North Texas Municipal Water District (NTMWD), and Tarrant Regional Water District (TRWD). In the 2006 Region C Water Plan, 26 Denton County water user groups list "additional UTRWD water" as one of the recommended water management strategies to meet their water demand projections.

Many UTRWD members use groundwater for a portion of their water supply. In Denton County, groundwater resources are very limited, and current groundwater use from the Trinity and Woodbine aquifers exceeds the estimated reliable long-term supply based on groundwater availability (2006 Region C Water Plan). Therefore, water suppliers in Denton County need to increase their use of surface water supplies. Based on UTRWD's 2009 water conservation plan, one of the key purposes of the regional Surface Water Supply and Wastewater Treatment Program is to avoid further draw-down of limited ground water resources, and to make surface water available for further growth.

According to the 2006 Region C Water Plan, UTRWD intends to transport 90% of the Lake Ralph Hall yield to Denton County. Thus, the project will benefit the receiving Trinity River Basin by providing water to Denton County mainly for municipal purposes. In addition, the IBT water can be used for Collin, Cooke, Dallas, Denton, Grayson, and Wise Counties within the Trinity River Basin for municipal, industrial, and agricultural purposes.

7

UTRWD submitted an economic analysis, "The Economic Impact of Lake Ralph Hall" with the water right application. UTRWD states that construction of Lake Ralph Hall will bring recreational and other benefits to the Sulphur River Basin. The report details the costs and benefits to Fannin County (in the basin of origin), and Denton County (in the receiving basin) from the construction of Lake Ralph Hall. The report shows that the benefits of the proposed IBT outweigh the costs to both the area in and around Fannin County and the area in and around Denton County. A net present worth analysis of these costs and benefits was performed for the period from 2004 through 2036. Based on the analysis, the net present worth of benefits to basin of origin is $147 million and the net present worth of benefits to receiving basin is $18 billion.

The 2006 Region C Water Plan identified a set of water conservation strategies that will result in the highest practicable level of conservation and efficiency achievable as required for IBTs under TWC 11.085. The Region C Plan's recommended water conservation strategies include a basic package that includes low-flow plumbing fixture rules, public and school education, water use reduction due to increasing water prices, water system audit, leak detection and repair, pressure control, and Federal residential clothes washer standards. Reuse of treated wastewater effluent has been identified as one of the strategies for an expanded water conservation package. UTRWD has included the identified water conservation strategies in its water conservation plan and included a model water conservation plan for its members and customers. In order to comply with TCEQ conservation rule requirements, UTRWD is required to submit a water conservation implementation report every five years. The implementation report must include: (a) the list of dates and descriptions of the conservation measures implemented; (b) data about whether or not targets in the plans are being met; (c) the actual amount of water saved; and (d) if the targets are not being met, an explanation as to why any of the targets are not being met, including any progress on that particular target.

As a wholesale public water supplier, UTRWD will develop and implement wholesale water contracts that include applicable water conservation and drought contingency requirements. In addition, one of the strategies identified by the Water Conservation Task Force Best Management Practices (BMP) Guide (TWDB Report 362), Wholesale Agency Assistance Programs BMP (BMP 2.14), is exclusively applicable to wholesale water suppliers. UTRWD has included elements of the wholesale BMP in its conservation plan. If UTRWD implements all elements of its water conservation plan, then staff believes that the highest practicable level of conservation for UTRWD can be achieved. By preparing a drought contingency plan and preparing and implementing a water conservation plan that will result in the highest practicable levels of water conservation and efficiency within its jurisdiction, and if UTRWD ensures through contracts that its customers develop water conservation plans that implement the recommended strategies listed in the approved Regional Water Plan, the application can meet the requirements of TWC 11.085(l)(2).

CONSISTENCY WITH STATE AND REGIONAL WATER PLANS
The Lake Ralph Hall Project is listed as one of the recommended water management strategies in the Region C Water Plan and the current State Water Plan and is one of the major water conveyances proposed by the planning group. This application is consistent with 2006 Region C

8

Water Plan and 2007 State Water Plan.

## SUMMARY

The application has been evaluated and determined to meet technical review requirements in TCEQ rules and applicable statutes. Staff determined that the listed conservation goals and strategies in UTRWD's water conservation plan can achieve the highest practicable levels of water conservation and efficiency in UTRWD's service area.

The application is consistent with the approved January 2006 Region C Water Plan and the 2007 State Water Plan because the Lake Ralph Hall project is listed as one of the recommended water management strategies for UTRWD in both plans.

## RECOMMENDATIONS

Staff recommends that, if the application is granted, the following water conservation language should be included in the permit:

Permittee shall implement water conservation plans that provide for the utilization of those practices, techniques, and technologies that reduce or maintain the consumption of water, prevent or reduce the loss or waste of water, maintain or improve the efficiency in the use of water, increase the recycling and reuse of water, or prevent the pollution of water, so that a water supply is made available for future or alternative uses. Such plans shall include a requirement that in every wholesale water contract entered into, on or after the effective date of this permit, including any contract extension or renewal, each successive wholesale customer develop and implement conservation measures that can result in the highest practicable levels of water conservation and efficiency in order to comply with TWC 11.085 (l)(2). If Permittee authorizes the resale of water by a customer, then the contract for resale must have water conservation requirements so that each successive wholesale customer in the resale of the water will be required to implement water conservation measures.

# Appendix 2

**TCEQ Docket No. 2012-0065-WR; SOAH Docket No. 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.** Consideration of the Administrative Law Judges' Proposal for Decision and Order regarding the application of Upper Trinity Regional Water District for Water Use Permit No. 5821 to construct and maintain a dam and reservoir (Lake Ralph Hall), on the North Sulphur River, Sulphur River Basin, in Fannin County for in-place recreational purposes and to divert and use not to exceed 45,000 acre-feet per year from the perimeter of the proposed reservoir for municipal, industrial, and agricultural purposes. The Applicant requests an authorization to transfer water from the Sulphur River Basin to the Trinity River Basin, for use in portions of Collin, Cooke, Dallas, Denton, Fannin, Grayson and Wise Counties. The Commission will also consider timely public comments, timely related filings, exceptions and replies. (James Aldredge, Ron Ellis)

Commissioner Dr. Bryan Shaw: Thank you. Any questions at this time? Thank you. If you have questions of ED if you want to go ahead and jump in there it'd be great.

Commissioner Toby Baker: Well I'd just love to hear your thoughts about what Mr Hess presented, I, I'm, uh, based on the record and what I read in the PFD I don't know if I agree with them and I'm wondering if you could just speak a little bit more about the water conservation plan and how you ended up where you are.

James Aldredge: Certainly, certainly. The legislature in 2003 I believe it was directed the Commission and the Water Development Board to jointly develop – and this is codified in the water code, and I'm going to paraphrase, I don't have it right in front of me but it was to develop best management practices, designed for the highest practicable level of water conservation and efficiency achievable within the jurisdiction of an individual water supplier. A couple of years after that, the Water Development Board, after a review process by the Water Conservation Task Force, published Report 362, which is titled Best Management Practices Guide for Water Conservation. Upper Trinity Regional Water District's conservation plan incorporates, not every best management practice, but a significant amount of them, and at least components of each of the individual best management practices that are published there; and the argument that National Wildlife Federation has made, and they had witness testimony to this effect at hearing, is that that guide is not intended to be the guide for best management practices for the highest practicable level of water conservation and efficiency achievable. The ED takes exception to that, if that guide isn't that, then one doesn't exist. It is the only statement, by either this Commission, or the Water Development Board, that directs any form of best management practice for water conservation. In that light, we believe, after our review of their water conservation plans, there have been repeated iterations of them, that they have consistently met what is required of them under Section 11.085 of the Water Code, the inter-basin transfer section, which, that's the standard: highest practicable level of water conservation and efficiency achievable. Further than that, we have to remember that Upper Trinity Regional Water District is a wholesale water provider. They don't make contracts with the end users of water. They have a limited scope of customers, all of their customers are retail water providers. The standards that they have to meet under Section 288.5 of our rules, which is the rule for wholesale water providers, they've met it; there is nothing in there about building into their supply contracts requirements that the retail water supplier customers then have to turn around and meet some particular level of efficiency. There are rules precisely for what retail water suppliers must do in

their individual water conservation plans, and the Executive Director reviews those, and they are subject to Executive Director approval. So we're confident that the highest level of water conservation and efficiency achievable within UTRWD's jurisdiction will happen as a result of the plan that they've developed. And we're pretty confident in that and we would recommend that you, that you find the same and in doing so issue the permit.

Commissioner Toby Baker: Thank you for that and that's sort of how I understood it and I wanted to just make sure that I was understanding it correctly, that the issue that they're presenting is sort of that they're saying that Report 362 isn't the standard, and I agree that there is no standard if we don't go there. So thank you for that, it was enlightening, thanks.

# Appendix 3

AN ACT

relating to the creation of a task force to evaluate matters regarding water conservation.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. DEFINITION. In this Act, "task force" means the water conservation implementation task force created under Section 2 of this Act.

SECTION 2. WATER CONSERVATION IMPLEMENTATION TASK FORCE. (a) The Texas Water Development Board shall select members of the water conservation implementation task force to represent the following entities and interest groups from applicants recommended by the following entities and interest groups:

        (1) Texas Commission on Environmental Quality;

        (2) Department of Agriculture;

        (3) Parks and Wildlife Department;

        (4) State Soil and Water Conservation Board;

        (5) Texas Water Development Board;

        (6) regional water planning groups;

        (7) federal agencies;

        (8) municipalities;

        (9) groundwater conservation districts;

        (10) river authorities;

        (11) environmental groups;

        (12) irrigation districts;

1

(13) industries;

(14) institutional water users;

(15) professional organizations focused on water conservation; and

(16) higher education.

(b) The executive administrator of the Texas Water Development Board or the administrator's designee is the presiding officer of the task force.

SECTION 3. DUTIES OF TASK FORCE. The task force shall review, evaluate, and recommend optimum levels of water use efficiency and conservation for the state by:

(1) identifying, evaluating, and selecting best management practices for municipal, industrial, and agricultural water uses and evaluating the costs and benefits for the selected best management practices;

(2) evaluating the implementation of water conservation strategies recommended in regional and state water plans;

(3) considering the need to establish and maintain a statewide public awareness program for water conservation;

(4) evaluating the proper role, if any, for state funding of incentive programs that may facilitate the implementation of best management practices and water conservation strategies;

(5) advising the Texas Water Development Board and the Texas Commission on Environmental Quality on:

(A) a standardized methodology for reporting and

2

using per capita water use data;

(B) establishing per capita water use targets and goals, accounting for such local effects as climate and demographics; and

(C) other possible uses as appropriate; and

(6) evaluating the appropriate state oversight and support of any conservation initiatives adopted by the legislature.

SECTION 4. ASSISTANCE OF STATE AGENCIES. The task force may request the assistance of state agencies, departments, or offices to carry out its duties, including necessary staff support.

SECTION 5. PUBLIC MEETINGS. The task force may hold public meetings as needed to fulfill its duties under this Act.

SECTION 6. BEST MANAGEMENT PRACTICES GUIDE; REPORT. Not later than November 1, 2004, the task force shall develop a best management practices guide for use by regional water planning groups and political subdivisions responsible for water delivery service and shall make a final report to the lieutenant governor, the speaker of the house of representatives, and the legislature evaluating the issues described in Section 3 of this Act.

SECTION 7. EXPIRATION OF ACT AND ABOLITION OF TASK FORCE. This Act expires and the task force is abolished on January 1, 2005.

SECTION 8. EFFECTIVE DATE. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2003.

S.B. No. 1094

_____  _____
President of the Senate        Speaker of the House

I hereby certify that S.B. No. 1094 passed the Senate on April 22, 2003, by the following vote: Yeas 31, Nays 0.

_____
Secretary of the Senate

I hereby certify that S.B. No. 1094 passed the House on May 6, 2003, by the following vote: Yeas 143, Nays 0, two present not voting.

_____
Chief Clerk of the House

Approved:

_____
Date

_____
Governor

4

# Appendix 4

AN ACT

relating to the establishment of minimum levels of water conservation in water conservation plans.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 11.1271, Water Code, is amended by amending Subsection (c) and adding Subsections (d), (e), and (f) to read as follows:

(c) Beginning May 1, 2005, all water conservation plans required under this section must include specific, quantified 5-year and 10-year targets for water savings. The entity preparing the plan shall establish the targets. Targets must include goals for water loss programs and goals for municipal use in gallons per capita per day.

(d) The commission and the board jointly shall identify quantified target goals for water conservation that water suppliers and other entities may use as guidelines in preparing water conservation plans. Goals established under this subsection are not enforceable requirements.

(e) The commission and board jointly shall develop model water conservation programs for different types of water suppliers that suggest best management practices for achieving the highest practicable levels of water conservation and efficiency achievable for each specific type of water supplier.

(f) The commission shall adopt rules establishing criteria

and deadlines for submission of water conservation plans, including any required amendments, and for submission of implementation reports.

SECTION 2. Section 15.106, Water Code, is amended by adding Subsection (b-1) to read as follows:

(b-1) Beginning May 1, 2005, all water conservation plans required under this section must include specific, quantified 5-year and 10-year targets for water savings. The entity preparing the plan shall establish the targets. Targets must include goals for water loss programs and goals for municipal use in gallons per capita per day.

SECTION 3. Section 17.125, Water Code, is amended by adding Subsection (b-1) to read as follows:

(b-1) Beginning May 1, 2005, all water conservation plans required under this section must include specific, quantified 5-year and 10-year targets for water savings. The entity preparing the plan shall establish the targets. Targets must include goals for water loss programs and goals for municipal use in gallons per capita per day.

SECTION 4. Section 17.277, Water Code, is amended by adding Subsection (b-1) to read as follows:

(b-1) Beginning May 1, 2005, all water conservation plans required under this section must include specific, quantified 5-year and 10-year targets for water savings. The entity preparing the plan shall establish the targets. Targets must include goals for water loss programs and goals for municipal use in gallons per capita per day.

SECTION 5.  Section 17.857, Water Code, is amended by adding Subsection (b-1) to read as follows:

(b-1)  Beginning May 1, 2005, all water conservation plans required under this section must include specific, quantified 5-year and 10-year targets for water savings. The entity preparing the plan shall establish the targets.  Targets must include goals for water loss programs and goals for municipal use in gallons per capita per day.

SECTION 6.  Not later than September 1, 2004, the Texas Commission on Environmental Quality and the Texas Water Development Board shall take the actions necessary to comply with Section 11.1271, Water Code, as amended by this Act.

SECTION 7.  (a)  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2003.

(b)  The change in law made by this Act to Section 11.1271, Water Code, applies to a holder of an existing permit, certified filing, or certificate of adjudication as described in Section 11.1271(b), Water Code, regardless of whether the permit, certified filing, or certificate of adjudication is obtained before, on, or after that date.

(c)  The changes in law made by this Act to Sections 15.106, 17.125, 17.277, and 17.857, Water Code, apply only to applications for financial assistance filed with the Texas Water Development Board on or after the effective date of this Act.

H.B. No. 2660

_____          _____
President of the Senate                        Speaker of the House

I certify that H.B. No. 2660 was passed by the House on May 2, 2003, by the following vote:  Yeas 126, Nays 0, 2 present, not voting.


                                         _____
                                              Chief Clerk of the House

I certify that H.B. No. 2660 was passed by the Senate on May 28, 2003, by the following vote:  Yeas 31, Nays 0.


                                         _____
                                              Secretary of the Senate

APPROVED:  _____
                  Date


           _____
                  Governor

4

# Appendix 5

# Easy Law Lookup

Texas Laws - Government Code
Sec. 2001.172. Scope Of Judicial Review.

| Home | Codes | Contents | Topics | Index | Search | Find A Lawyer | Legal Dictionary | | Print |

quick search...  [Go]

## Texas Laws - Government Code
## TITLE 10. GENERAL GOVERNMENT
## SUBTITLE A. ADMINISTRATIVE PROCEDURE AND PRACTICE

### Sec. 2001.172. SCOPE OF JUDICIAL REVIEW. [72842] (1-click HTML)

The scope of judicial review of a state agency decision in a contested case is as provided by the law under which review is sought. [72843]

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993. [72844]

| Previous | Next |
| --- | --- |
| Sec. 2001.171. Judicial Review. | Sec. 2001.173. Trial De Novo Review. |

**Lakisha Thigpen***
Austin Divorce Attorney
Website

Lakisha Thigpen is an experienced divorce lawyer serving Austin and surrounding areas.

24047239-free

**George Ward IV**
Travis County Lawyer

Experienced government attorney.

24047070-frotate

**Michael Ernest Archuleta**
Travis County Lawyer

Experienced government attorney.

00783555-frotate

**John Joseph Carlton**
Travis County Lawyer

Experienced government attorney.

03817600-frotate

**Ketli A. N. Carlton**
Travis County Lawyer

Experienced government attorney.

15091175-frotate

**Mollie Cullinane**
Travis County Lawyer

Experienced government attorney.

24033449-frotate

**Hector Deleon**
Travis County Lawyer

Experienced government attorney.

05650800-frotate

**Leonard B. Gabbay**
Travis County Lawyer

Experienced government attorney.

07562950-frotate

**Rick Kennon**
Travis County Lawyer

Experienced government attorney.

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle C. Water Development
        Chapter 16. Provisions Generally Applicable to Water Development (Refs & Annos)
          Subchapter C. Planning

V.T.C.A., Water Code § 16.053

§ 16.053. Regional Water Plans

Effective: September 1, 2011
Currentness

(a) The regional water planning group in each regional water planning area shall prepare a regional water plan, using an existing state water plan identified in Section 16.051 of this code and local water plans prepared under Section 16.054 of this code as a guide, if present, that provides for the orderly development, management, and conservation of water resources and preparation for and response to drought conditions in order that sufficient water will be available at a reasonable cost to ensure public health, safety, and welfare; further economic development; and protect the agricultural and natural resources of that particular region.

(b) No later than September 1, 1998, the board shall designate the areas for which regional water plans shall be developed, taking into consideration such factors as river basin and aquifer delineations, water utility development patterns, socioeconomic characteristics, existing regional water planning areas, political subdivision boundaries, public comment, and other factors the board deems relevant. The board shall review and update the designations as necessary but at least every five years.

(c) No later than 60 days after the designation of the regions under Subsection (b), the board shall designate representatives within each regional water planning area to serve as the initial coordinating body for planning. The initial coordinating body may then designate additional representatives to serve on the regional water planning group. The initial coordinating body shall designate additional representatives if necessary to ensure adequate representation from the interests comprising that region, including the public, counties, municipalities, industries, agricultural interests, environmental interests, small businesses, electric generating utilities, river authorities, water districts, and water utilities. The regional water planning group shall maintain adequate representation from those interests. In addition, the groundwater conservation districts located in each management area, as defined by Section 36.001, located in the regional water planning area shall appoint one representative of a groundwater conservation district located in the management area and in the regional water planning area to serve on the regional water planning group. In addition, representatives of the board, the Parks and Wildlife Department, and the Department of Agriculture shall serve as ex officio members of each regional water planning group.

(d) The board shall provide guidelines for the consideration of existing regional planning efforts by regional water planning groups. The board shall provide guidelines for the format in which information shall be presented in the regional water plans.

(e) Each regional water planning group shall submit to the development board a regional water plan that:

(1) is consistent with the guidance principles for the state water plan adopted by the development board under Section 16.051(d);

# Appendix 6

<<Prev Rule                      Next Rule>>

# Texas Administrative Code

| TITLE 30 | ENVIRONMENTAL QUALITY |
| --- | --- |
| PART 1 | TEXAS COMMISSION ON ENVIRONMENTAL QUALITY |
| CHAPTER 295 | WATER RIGHTS, PROCEDURAL |
| SUBCHAPTER A | REQUIREMENTS OF WATER RIGHTS APPLICATIONS GENERAL PROVISIONS |
| DIVISION 1 | GENERAL REQUIREMENTS |
| RULE §295.9 | Water Conservation and Drought Contingency Plans |

An application relating to the appropriation or use of state water must include water conservation and drought contingency plans meeting applicable requirements contained in this section. An application not accompanied by such plans is not administratively complete and shall not be considered by the commission, unless expressly exempted by this section. The water conservation plan must demonstrate that reasonable diligence will be used to avoid waste and achieve water conservation in order that appropriated waters will be beneficially used for the authorized purposes. Conservation means those practices, techniques, and technologies that will reduce the consumption of water, prevent or reduce the loss or waste of water, maintain or improve the efficiency in the use of water, increase the recycling and reuse of water, or prevent the pollution of water so that a water supply is made available for future or alternative uses for the benefit of the public health, safety and welfare, and of the environment.

(1) Applications to appropriate or to use water for municipal use, industrial or mining use, or agricultural use, including irrigation use. The water conservation and drought contingency plans submitted with an application to appropriate or to use state water for municipal use, industrial or mining use, or agricultural use must be submitted in accordance with the guidelines set forth in Chapter 288 of this title (relating to Water Conservation Plans, Drought Contingency Plans, Guidelines and Requirements).

(2) Applications to appropriate or to use water by wholesale water suppliers. A water conservation plan submitted with an application to appropriate or to use state water by a wholesale water supplier must be submitted in accordance with the guidelines set forth in Chapter 288 of this title.

(3) Applications to appropriate or to use water for any other purpose or use. A water conservation plan submitted with an application to appropriate or to use state water for any other purpose or use shall include a water conservation plan providing information where applicable about those practices, techniques, and technologies that will be used to reduce the consumption of water, prevent or reduce the loss or waste of water, maintain or improve the efficiency in the use of water, increase the recycling and reuse of water, or prevent the pollution of water.

(4) Applications to amend existing water rights. An application to amend an existing water right for any of the following reasons must be accompanied by water conservation and drought contingency plans in accordance with the applicable provisions of this section:

    (A) to increase the amount of the appropriation;

    (B) to extend the term of the appropriation;

(C) to change the place of use, unless the request is to expand the amount of acreage to be irrigated adjacent to the existing, authorized irrigated tract without an increase in the appropriation; or

(D) to change the purpose or use of the appropriation (a conservation plan to change the purpose or use of an appropriation need only address the proposed change in purpose or use; however, the executive director may require an applicant to submit a water conservation plan which addresses the applicant's entire water uses and/or appropriations).

(5) Exemptions to the requirement to submit water conservation plans. Applications to impound water for in-place use only, for emergency use in accordance with §295.91 of this title (relating to Requirements for Application for Emergency Water Use Permit) and for temporary use of water in accordance with §295.61 of this title (relating to Additional Requirements for Applications for Temporary Permits) are exempt from having to submit a water conservation plan pursuant to this section. However, all water right holders must exercise reasonable diligence to avoid waste and achieve water conservation so that the right to use state water is limited to the amount which is being or can be beneficially used for the authorized purposes but not to exceed the amount specifically appropriated.

---

**Source Note:** The provisions of this §295.9 adopted to be effective May 28, 1986, 11 TexReg 2324; amended to be effective May 3, 1993, 18 TexReg 2558; amended to be effective February 21, 1999, 24 TexReg 969; amended to be effective August 15, 2002, 27 TexReg 7149